# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES ODOM,

　　　　　　*Plaintiff-Appellant,*

　　　　　　v.

MICROSOFT CORPORATION, a
Washington corporation; BEST BUY
CO., INC., a Minnesota corporation,
　　　　　　*Defendants-Appellees.*

No. 04-35468

D.C. No.
CV-03-02976-MJP

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
December 13, 2006—San Francisco, California

Filed May 4, 2007

Before: Mary M. Schroeder, Chief Circuit Judge,
Stephen Reinhardt, Diarmuid F. O'Scannlain,
Pamela Ann Rymer, Michael Daly Hawkins,
Sidney R. Thomas, Barry G. Silverman, William A. Fletcher,
Raymond C. Fisher, Richard A. Paez, Marsha S. Berzon,
Richard C. Tallman, Johnnie B. Rawlinson, Jay S. Bybee,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge William A. Fletcher;
Concurrence by Judge Silverman;
Concurrence by Judge Bybee

**COUNSEL**

Beth Terrell, Tousley Brain Stephens P.L.L.C., Seattle, Washington; Daniel C. Girard (argued), Girard Gibbs and De Bartolomeo LLP, San Francisco, California; Anthony K. Lee, San Francisco, California, for the plaintiff-appellant.

Charles C. Sweedler & Charles B. Casper, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pennsylvania; Jonathan M. Palmer, Heller Ehrman, Seattle, Washington; Michael J. Shepard (argued), Heller Ehrman, San Francisco, California, for defendant-appellee Microsoft Corporation.

Stacy S. Schwartz, Robins Kaplan Miller & Ciresi, Los Angeles, California; James Richard Murray, Gordon Murray Tilden, Seattle, Washington; J. Kevin Snyder, Dykema Gossett, Los Angeles, California, for defendant-appellee Best Buy Co.

**OPINION**

W. FLETCHER, Circuit Judge:

Putative class action plaintiffs appeal from the dismissal of their suit under Federal Rule of Civil Procedure 12(b)(6) for failure to allege an "associated in fact" "enterprise" under RICO and, in the alternative, under Federal Rule of Civil Procedure 9(b) for failure to plead wire fraud with particularity. The district court dismissed with prejudice and without leave to amend.

We reverse and remand.

## I. Background

Named plaintiff James Odom — then the only plaintiff — filed the first complaint in this action in the Northern District of California, alleging that defendants Microsoft and Best Buy had violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d). Odom alleged that in April 2000 defendants entered into an agreement under which "Microsoft invested $200 million in Best Buy and agreed to promote Best Buy's online store through its MSN service." MSN is a division of Microsoft offering Internet access services. In return, "Best Buy agreed to promote MSN service and other Microsoft products in its stores and advertising." Odom alleged that pursuant to their agreement, Best Buy employees distributed different Microsoft compact discs ("Trial CDs") depending on what the customer purchased. For example, a customer who purchased a computer would receive a Trial CD providing a free six-month subscription to MSN. A customer who purchased a cell phone would receive a Trial CD providing a free thirty-day subscription.

Odom alleged that if the customer was paying by debit or credit card the Best Buy employee would scan the Trial CD. If asked why the Trial CD had been scanned, the Best Buy employee would claim it was for "inventory control or otherwise misrepresent[ ] the purpose of the scanning." Odom alleged that what this scanning actually did was send the information to Microsoft. Microsoft would then, without the customer's knowledge or permission, activate an MSN account in the customer's name. If the customer did not cancel the account before the expiration of the free trial period, Microsoft would start billing the debit or credit card number. Odom further alleged that when customers called to dispute these charges, Microsoft directed some of them to "seek relief from their debit or credit card issuers."

Odom alleged that the "policies and practices by Best Buy and its employees relating to distribution of the Trial CDs —

including but not limited to the deliberate failure to make disclosures and making of misrepresentations — have been formulated and implemented by Best Buy jointly with Microsoft, by agreement with Microsoft, and/or with Microsoft's knowledge and approval for the benefit of both Best Buy and Microsoft." Odom alleged that no affected customer had been fully compensated for his or her losses, defined as (1) a full refund of the unauthorized charges; (2) a full refund of the accrued finance charges; (3) payment of interest on the money during the time it was held by Microsoft; and (4) compensation for the "time, effort, and expense" incurred in cancelling MSN accounts and seeking refunds. Odom alleged that these losses resulted from defendants' actions taken pursuant to their agreement.

Odom alleged that he purchased a laptop computer by credit card from a Best Buy store in Contra Costa County, California, in May 2002. He alleged that he told the Best Buy employee that he did not need the Trial CD because he already had another Internet service, and that the Best Buy employee did not tell him that an MSN account with Microsoft was being established in his name or that any financial obligation was being imposed on him. He further alleged that he never used the free six-month service that came with his computer purchase. After the six-month period, Microsoft began charging his account. Odom alleged that when he noticed the charges he called Microsoft and cancelled the service.

Odom alleged that defendants' acts constituted violations of civil RICO, 18 U.S.C. §§ 1962(c) and (d). Odom alleged that Best Buy and Microsoft, acting together pursuant to their agreement, constituted an associated-in-fact enterprise under RICO; that their actions, involving "thousands" of consumers, constituted a "pattern of racketeering activity" under RICO; and that they committed the RICO "racketeering activity" predicate act of wire fraud in violation of 18 U.S.C. § 1343.

Microsoft, joined by Best Buy, moved to dismiss under Rule 12(b)(6) for failure to allege an associated-in-fact enterprise, and under Rule 9(b) for failure to plead wire fraud with particularity. Microsoft also moved to transfer the case from California to the Western District of Washington based on a forum selection clause contained in the MSN subscriber agreement. The California district court transferred the case to Washington without ruling on the motion to dismiss. After transfer, Microsoft withdrew its motion to dismiss based on Odom's indication that he intended to amend the complaint.

An amended complaint was filed on November 19, 2003. Odom continues as a plaintiff. He adds slightly more detail to the allegations made in the first complaint. He now specifies that the Best Buy store was in Pleasant Hill, California, rather than merely in Contra Costa County. He further alleges that Microsoft billed his credit card account for two months after the expiration of the six-month period, that he has paid these credit card charges, and that he has not received any refund or credit for these charges.

Katherine Moureaux-Maloney was added as a second plaintiff. Moureaux-Maloney alleges that in September 2001 she purchased a cell phone and a cell phone service plan at a Best Buy store in Reno, Nevada, using a debit card. She alleges that a Best Buy employee scanned a Trial CD and swiped her debit card, thereby sending the information to Microsoft and establishing a thirty-day trial subscription in her name. The employee did not tell Moureaux-Maloney that this was being done. Moureaux-Maloney did not know she had this service and never used it. After the thirty days elapsed, Microsoft withdrew monthly MSN charges from Moureaux-Maloney's debit card account for seventeen months without her knowledge or authorization. In November 2003, Moureaux-Maloney received a bill from Microsoft for monthly MSN charges for April, May, and June 2003 after "Microsoft was unable to continue withdrawing the charges from her debit card account." Upon receiving this bill,

Moureaux-Maloney and her husband immediately contacted Microsoft and discovered that the MSN account had been established in her name through Best Buy. Upon reviewing her bank statements, she discovered the withdrawals Microsoft had made for seventeen months. Finally, Moureaux-Maloney alleges that she "has not received any refund for any of the MSN charges that Microsoft withdrew from her debit card account, and Microsoft continues to seek payment from her of MSN charges for April, May, and June 2003."

Plaintiffs expanded the enterprise-related allegations in the first complaint by further describing the agreement between Microsoft and Best Buy. The amended complaint contains the following addition:

> In Defendants' own words (in a joint press release), this agreement is "a comprehensive strategic alliance that encompasses broadband, narrowband, in-store and online efforts"; "provides for significant joint marketing in Best Buy's retail stores, online and through print/broadcast vehicles, profit sharing, the promotion of BestBuy.com to the 40 million users throughout Microsoft's properties, and technology assistance"; and pursuant to which "MSN™ Internet access and Microsoft's full range of connectivity solutions will be demonstrated and sold at the more than 350 Best Buy stores in the U.S. and through BestBuy.com," and "Best Buy and BestBuy.com will receive prominent and preferred placement across Microsoft Properties, including MSNBC, and the Expedia.com™ travel service, Hotmail™ Web-based e-mail service, WebTV Network™, and the newly launched MSN eShop online shopping service."

Microsoft and Best Buy again moved to dismiss the RICO claims under Rule 12(b)(6) and Rule 9(b). The district court dismissed the amended complaint on both grounds without

leave to amend. It held that an associated-in-fact enterprise had not been alleged within the meaning of RICO under Rule 12(b)(6), and that wire fraud had not been pled with particularity under Rule 9(b). Plaintiffs then voluntarily dismissed their non-RICO claims in order to allow entry of final judgment. Plaintiffs appeal the dismissal of their RICO claims.

## II.  Standard of Review

We review de novo a dismissal for failure to state a claim under Rule 12(b)(6). *Cervantes v. United States*, 330 F.3d 1186, 1187 (9th Cir. 2003). We read the complaint in the light most favorable to the non-moving party. Allegations in the complaint, together with reasonable inferences therefrom, are assumed to be true for purposes of the motion. *Associated Gen. Contractors v. Metro. Water Dist.*, 159 F.3d 1178, 1181 (9th Cir. 1998). A dismissal for failure to state a claim pursuant to 12(b)(6) should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248 (9th Cir. 1997) (internal quotation marks omitted) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)); *see also* Fed. R. Civ. P. 8(a).

We review de novo dismissals for failure to plead with particularity under Rule 9(b). *In re Daou Sys., Inc.*, 411 F.3d 1006, 1013 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 1335 (2006).

## III.  Discussion

## A.  RICO

[1] The Racketeer Influenced and Corrupt Organizations ("RICO") Act, passed in 1970 as Title IX of the Organized Crime Control Act, provides for both criminal and civil liability. Pub. L. No. 91-452, § 901, 84 Stat. 922 (1970) (codified at 18 U.S.C. §§ 1961-1968). Civil RICO provides for treble

damages. 18 U.S.C. § 1964(c). There has been some judicial resistance to RICO, manifested in narrow readings of its provisions by lower federal courts. In four notable cases, the Supreme Court has corrected these narrow readings.

The first case was *United States v. Turkette*, 452 U.S. 576 (1981), which we discuss in detail later in this opinion. The First Circuit had read RICO to prohibit only the infiltration of legitimate businesses by organized crime. *United States v. Turkette*, 632 F.2d 896, 899 (1st Cir. 1980). In its view, RICO did not prohibit criminal acts by purely criminal enterprises. *Id.* The Supreme Court held that the court of appeals had "clearly departed from and limited the statutory language." *Turkette*, 452 U.S. at 581. The Court explained:

> As a measure to deal with the infiltration of legitimate businesses by organized crime, RICO was both preventive and remedial. . . . If Congress had intended the more circumscribed approach espoused by the Court of Appeals, there would have been some positive sign that the law was not to reach organized criminal activities that give rise to the concerns about infiltration. The language of the statute, however — the most reliable evidence of its intent — reveals that Congress opted for a far broader definition of the word "enterprise," and we are unconvinced by anything in the legislative history that this definition should be given less than its full effect.

*Id.* at 593.

The second case was *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 481 (1985), in which the Second Circuit had read civil RICO to impose liability only against defendants who had been criminally convicted, and only for what the court termed "racketeering injury." The Supreme Court disagreed with both propositions. It noted that the court of appeals had narrowly construed RICO in order to avoid what that court

viewed as "intolerable practical consequences." *Id.* at 490. But the Court insisted that a "less restrictive reading" was required by the text of the statute. It wrote:

> RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to "be liberally construed to effectuate its remedial purposes."
>
> . . . .
>
> Underlying the Court of Appeals' holding was its distress at the "extraordinary, if not outrageous," uses to which civil RICO has been put. Instead of being used against mobsters and organized criminals, it has become a tool for everyday fraud cases brought against "respected and legitimate 'enterprises.' " Yet Congress wanted to reach both "legitimate" and "illegitimate" enterprises. The former enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences. . . .
>
> It is true that private civil actions under the statute are being brought almost solely against such defendants, rather than against the archetypal, intimidating mobster. Yet this defect — if defect it is — is inherent in the statute as written, and its correction must lie with Congress.

*Id.* at 497-98, 499 (citations omitted).

The third case was *National Organization for Women v. Scheidler*, 510 U.S. 249 (1994), in which the Seventh Circuit had read civil RICO to provide liability only when acts of a RICO enterprise had an economic motive. The Supreme Court refused to read such a limitation into the statute. It wrote,

In *United States v. Turkette*, we faced the analogous question whether "enterprise" as used in § 1961(4) should be confined to "legitimate" enterprises. Looking to the statutory language, we found that "[t]here is no restriction upon the associations embraced by the definition: an enterprise includes any union or group of individuals associated in fact." . . .

The parallel to the present case is apparent. Congress has not, either in the definitional section or in the operative language, required that an "enterprise" in § 1962(c) have an economic motive.

*Id.* at 260-61 (citations omitted).

The fourth case was *Cedric Kushner Promotions v. King*, 533 U.S. 158 (2001), a civil RICO case in which the Second Circuit had held that the president and sole shareholder of a corporation could not be a "person" who "conduct[s] or participate[s] . . . in the conduct of [the corporate] enterprise's affairs." *Id.* at 160 (quoting 18 U.S.C. § 1962(c)) (ellipsis in original; brackets added). In the view of the court of appeals, the president and sole shareholder was therefore not a "person" made liable under RICO. *Id.* at 161. The Supreme Court disagreed with this narrow construction. Characterizing the question as whether the president and sole shareholder (the "person") was legally distinct from the corporation (the "enterprise"), the Court wrote, "The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that." *Id.* at 163.

**[2]** We take from these cases the general instruction that we should not read the statutory terms of RICO narrowly. Rather, as the Court wrote in *Sedima*, "RICO is to be read broadly."

473 U.S. at 497. As Congress admonished and as the Court repeated in *Sedima*, RICO should "be liberally construed to effectuate its remedial purposes." *Id.* at 498; RICO § 904(a).

## B. Plaintiffs' Suit

Plaintiffs allege that defendants have violated two provisions of RICO. First, they allege violation of 18 U.S.C. § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Second, they allege violation of 18 U.S.C. § 1962(d), which provides:

> It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

In the posture of this appeal, the survival of plaintiffs' claim under § 1962(c) will ensure the survival of their claim under § 1962(d). *See Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000). We therefore address, in the remainder of this opinion, only plaintiffs' claim under § 1962(c).

**[3]** To state a claim under § 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima*, 473 U.S. at 496 (footnote omitted). The only questions presented in this appeal concern requirements (2) and (4). First, Microsoft and Best Buy contend that plaintiffs have not alleged an "associated in fact" "enterprise" under RICO. Second, Microsoft and Best Buy

contend that while plaintiffs have properly identified wire fraud as a predicate act of "racketeering activity," they have not pled fraud with particularity. We address these two contentions in turn.

## 1.   Associated-in-Fact Enterprise

**[4]** The definition of "enterprise" in the text of RICO is fairly straightforward. In its entirety, the definition is as follows: " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). As is evident from the text, this definition is not very demanding. A single "individual" is an enterprise under RICO. Similarly, a single "partnership," a single "corporation," a single "association," and a single "other legal entity" are all enterprises. At issue in this case is the last kind of enterprise listed in the definition — a "group of individuals associated in fact." It is undisputed that a corporation can be an "individual" for purposes of an associated-in-fact enterprise. What is disputed is the manner in which a group must be associated.

### a.   *United States v. Turkette*

In *United States v. Turkette*, 452 U.S. 576 (1981), the only Supreme Court case directly on point, defendants were alleged to have been an associated-in-fact enterprise within the meaning of §§ 1961(4) and 1962(c). In the words of the statute, they were alleged to have been a "group of individuals associated in fact" for the purpose of engaging in acts constituting "a pattern of racketeering activity." The First Circuit had agreed with defendants that RICO was designed "solely to protect legitimate business enterprises from infiltration by racketeers and that RICO does not make criminal the participation in an association which performs only illegal acts and which has not infiltrated or attempted to infiltrate a legitimate enterprise." *Id.* at 579-80. The Supreme Court reversed, hold-

ing that a "group of individuals associated in fact" was an enterprise under RICO even if the purpose of the enterprise was exclusively criminal. *Id.* at 593.

In the course of its analysis, the Court refuted various analytic mistakes by the court of appeals. The First Circuit's conclusion that RICO did not apply to wholly illegal enterprises depended in part on its reasoning that a contrary holding would render portions of the statute superfluous. The court of appeals had stated,

> "If 'a pattern of racketeering' can itself be an 'enterprise' for purposes of section 1962(c), then the two phrases 'employed by or associated with any enterprise' and 'the conduct of such enterprise's affairs through [a pattern of racketeering activity]' add nothing to the meaning of the section. The words of the statute are coherent and logical only if they are read as applying to legitimate enterprises."

*Turkette*, 452 U.S. at 582 (quoting *United States v. Turkette*, 632 F.2d 896, 899 (1st Cir. 1980) (alteration in original)).

The Supreme Court was at pains to correct the court of appeals' reading of the statute. It wrote:

> [The court of appeals' conclusion] is based on a faulty premise. That a wholly criminal enterprise comes within the ambit of the statute does not mean that a "pattern of racketeering activity" is an "enterprise." In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the

statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. *The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages.*

*Id.* at 583 (citation omitted; emphasis added).

**[5]** In context, this passage from *Turkette* is easy to understand. The court of appeals had mistakenly equated the term "enterprise" with the term "pattern of racketeering activity." The Supreme Court pointed out that the terms refer to two concepts that are "separate and apart" from one another: The "enterprise" is the actor, and the "pattern of racketeering activity" is an activity in which that actor engages. *See id.* These separate concepts can be expressed grammatically: "Enterprise" is the subject, and "pattern of racketeering activity" is part of the predicate. Actions that form the "pattern of racketeering activity" are often referred to as "predicate" acts, though likely not in the grammatical sense. *See, e.g.*, *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168 (9th Cir. 2002); *Howard*, 208 F.3d at 746. In the words of the Court, italicized above, "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 583.

**[6]** *Turkette* further explained that proof of a "pattern of racketeering activity" is not, by itself, proof of an "enterprise." *Id.* "Enterprise" and "pattern of racketeering activity" are separate elements that require separate proof. In the words of the Court, "[t]he existence of an enterprise at all times

remains a separate element which must be proved by the Government." *Id.* (stating that "[w]hile the proof used to establish these separate elements [of "enterprise" and "pattern of racketeering activity"] may in particular cases coalesce, proof of one does not necessarily establish the other").

### b. Confusion in the Lower Courts

The Court's explanation of the meaning of an associated-in-fact enterprise in *Turkette* has not been clearly understood in the lower courts, including our own. We have taken this case en banc to correct and clarify our case law.

Four circuits have read the language in *Turkette* to require that an associated-in-fact enterprise have some kind of ascertainable separate structure. The formulations vary among these circuits, but they all require that there be an ascertainable organizational structure beyond whatever structure is required to engage in the pattern of illegal racketeering activity. *See, e.g.*, *Asa-Brandt, Inc. v. ADM Investor Servs., Inc.*, 344 F.3d 738, 752 (8th Cir. 2003) ("enterprise must have . . . an ascertainable structure distinct from the pattern of racketeering"); *United States v. Sanders*, 928 F.2d 940, 944 (10th Cir. 1991) ("enterprise" requires evidence of "an ascertainable structure that exist[s] apart from the commission of racketeering acts"); *United States v. Tillett*, 763 F.2d 628, 632 (4th Cir. 1985) ("enterprise" requires evidence "to show that the organization had an existence beyond that which was necessary to commit the predicate crimes" (citations omitted)); *United States v. Riccobene*, 709 F.2d 214, 223-24 (3d Cir. 1983) ("enterprise" must have "an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses"); *United States v. Bledsoe,* 674 F.2d 647, 665 (8th Cir. 1982) (proof of ascertainable structure "might be demonstrated by proof that a group engaged in a diverse pattern of crimes or that it has an organizational pattern or system of authority beyond what was necessary to perpetrate the predicate crimes").

The Seventh Circuit requires that there be "some" kind of ascertainable structure, but it does not require that it be a separate structure. *See, e.g.*, *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir. 1995) (requiring proof of "an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making" (internal quotation marks and citation omitted)); *see also United States v. Rogers*, 89 F.3d 1326, 1337-38 (7th Cir. 1996) (imposing "some" structural requirements, but concluding that it would be "nonsensical to require proof that an enterprise had purposes or goals separate and apart from the pattern of racketeering activity").

By contrast, four circuits have rejected any requirement that there be an "ascertainable structure," separate or otherwise, for an associated-in-fact enterprise. *See, e.g.*, *United States v. Patrick*, 248 F.3d 11, 19 (1st Cir. 2001) ("Since Congress intended the term 'enterprise' to include both legal and criminal enterprises, and because the latter may not observe the niceties of legitimate organizational structures, we refuse to import an 'ascertainable structure' requirement into jury instructions." (citation omitted)); *United States v. Perholtz*, 842 F.2d 343, 354 (D.C. Cir. 1988) (concluding that enterprise is "established by common purpose among the participants, organization, and continuity"); *United States v. Cagnina*, 697 F.2d 915, 921 (11th Cir. 1983) ("*Turkette* did not suggest that the enterprise must have a distinct, formalized structure."); *United States v. Bagaric*, 706 F.2d 42, 56 (2d Cir. 1983) (stating that "it is logical to characterize any associative group in terms of what it *does*, rather than by abstract analysis of its structure" (emphasis in original)), *abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler,* 510 U.S. 249 (1994).

**[7]** Our own circuit has equivocated on whether an associated-in-fact enterprise must have an ascertainable separate structure and, if so, what functions that structure must serve. *See, e.g.*, *United States v. Feldman*, 853 F.2d 648, 659-

60 (9th Cir. 1988) (declining to decide whether proof of ascertainable structure is necessary for an associated-in-fact enterprise because the legitimate corporations constituting the enterprise each had organizational structures); *River City Mkts., Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1461 (9th Cir. 1992) (concluding that "business relationship akin to a joint venture" was sufficient to establish an associated-in-fact RICO enterprise); *Chang v. Chen*, 80 F.3d 1293, 1299 (9th Cir. 1996) (explaining that "it is sufficient to show that the organization has an existence beyond that which is merely necessary to commit the predicate acts of racketeering" and citing the Third Circuit's decision in *Riccobene*, 709 F.2d at 224). The confusion in our precedents has caused difficulties for the district courts in this circuit. *See, e.g.*, *Hansen v. Ticket Track, Inc.*, 280 F. Supp. 2d 1196, 1206 (W.D. Wash. 2003) ("The Court acknowledges that the Ninth Circuit case law defining an association in fact using the 'separate structure' analysis is less than clear.").

**[8]** We take this opportunity to join the circuits that hold that an associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise. *See Patrick*, 248 F.3d at 19 (1st Cir. 2001); *Perholtz*, 842 F.2d at 355 (D.C. Cir. 1988); *Cagnina*, 697 F.2d at 921 (11th Cir. 1983); *Bagaric*, 706 F.2d at 55-56 (2d Cir. 1983). To the extent that our past precedent suggests the contrary, it is hereby overruled. *See, e.g.*, *Wagh v. Metris Direct, Inc.*, 348 F.3d 1102, 1112 (9th Cir. 2003); *Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073, 1083-84 (9th Cir. 2000); *Chang*, 80 F.3d at 1298-99, 1301.

 c.   No Requirement of Separate or Ascertainable Structure

As we explain above, the Supreme Court's statement in *Turkette* that an "enterprise" is "an entity separate and apart from the pattern of activity in which it engages" is not a statement that an associated-in-fact enterprise must have some kind of separate structure. 452 U.S. at 583. Rather, it is

merely a statement of the obvious: The enterprise and its
activity are two separate things. One is the enterprise. The
other is its activity.

To read the Court's statement in *Turkette* as requiring that
an associated-in-fact enterprise have a structure beyond that
necessary to carry out its pattern of illegal racketeering activi-
ties is not only to misread the particular passage of *Turkette*.
It is also fundamentally to misunderstand *Turkette*'s holding.
The First Circuit in *Turkette* had read RICO to impose liabil-
ity only when a legitimate business was infiltrated by a crimi-
nal enterprise. In the view of the court of appeals, RICO did
not impose liability on purely criminal enterprises. The
Supreme Court reversed.

To require that an associated-in-fact enterprise have a struc-
ture beyond that necessary to carry out its racketeering activi-
ties would be to require precisely what the Court in *Turkette*
held that RICO does *not* require. Such a requirement would
necessitate that the enterprise have a structure to serve both
illegal racketeering activities as well as legitimate activities.
In other words, it would require — as the First Circuit sought
to require in *Turkette* — that the enterprise have a structure
serving both illegitimate and legitimate purposes. But the
Court in *Turkette* held precisely the opposite. It held that a
purely criminal enterprise can be an associated-in-fact enter-
prise within the meaning of RICO. *See also Cedric Kushner
Promotions*, 533 U.S. at 164-65 (stating that RICO "protects
the public from those who would unlawfully use an 'enter-
prise' (whether legitimate or illegitimate) as a 'vehicle'
through which 'unlawful . . . activity is committed' ") (ellipsis
in original; citations omitted).

Further, to require that an associated-in-fact enterprise have
an "ascertainable structure" — whether that structure serves
both legitimate and illegitimate activities, or only illegitimate
activities — is also to misread *Turkette*. As the First Circuit
stated in *Patrick*, such a requirement improperly narrows the

definition of an associated-in-fact enterprise because criminal enterprises "may not observe the niceties of legitimate organizational structures." 248 F.3d at 19. There must, of course, be an associated-in-fact enterprise, as required by the statute and as explained in *Turkette*. But there is no additional requirement that the enterprise have an "ascertainable structure."

### d. Criteria for an Associated-in-Fact Enterprise

**[9]** The Supreme Court in *Turkette* articulated the criteria for an associated-in-fact enterprise under RICO. According to the Court, an associated-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." 452 U.S. at 583. To establish the existence of such an enterprise, a plaintiff must provide both "evidence of an ongoing organization, formal or informal," and "evidence that the various associates function as a continuing unit." *Id*. We consider these criteria in turn.

### i. Common Purpose

**[10]** We first conclude that plaintiffs have sufficiently alleged that defendants Best Buy and Microsoft have associated for "a common purpose of engaging in a course of conduct." *Id.* According to the complaint, defendants had the common purpose of increasing the number of people using Microsoft's Internet Service, and doing so by fraudulent means. Best Buy furthered this common purpose by distributing Microsoft Internet Trial CD's and conveying its customers' debit and credit card information to Microsoft. Microsoft then used the information to activate customer accounts. These allegations are more than adequate to establish, if true, that Microsoft and Best Buy had a common purpose of increasing the number of people using Microsoft's Internet service through fraudulent means.

### ii. Ongoing Organization

**[11]** We next conclude that plaintiffs sufficiently alleged an "ongoing organization," either "formal or informal." *Turkette*,

452 U.S. at 583. An ongoing organization is "a vehicle for the commission of two or more predicate crimes." *Cagnina*, 697 F.2d at 921-22 (internal quotation marks omitted) (quoting *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir. 1978)). According to plaintiffs, Microsoft and Best Buy formed a vehicle for the commission of at least two predicate acts of fraud. Microsoft and Best Buy established mechanisms for transferring plaintiffs' personal and financial information from Best Buy to Microsoft. That information then allowed Microsoft to activate plaintiffs' Internet accounts without their knowledge or permission. These mechanisms enabled Microsoft to bill plaintiffs improperly for MSN services in 2001, 2002 and 2003. *See United States v. Qaoud*, 777 F.2d 1105, 1117 (6th Cir. 1985) (stating that "coordinated nature" of defendant's activity supported finding of RICO enterprise). The alleged cross-marketing contract between Microsoft and Best Buy provides additional evidence of an ongoing organization. Plaintiffs allege that, in addition to the transfer of customers' information from Best Buy to Microsoft, "Best Buy agreed to promote MSN and other Microsoft products in its stores and advertising." In exchange, plaintiffs allege, "Microsoft invested $200 million in Best Buy and agreed to promote Best Buy's online store through its MSN service."

### iii.   Continuing Unit

**[12]** Finally, we conclude that plaintiffs have alleged facts that, if proved, provide sufficient "evidence that the various associates function as a continuing unit." *Turkette*, 452 U.S. at 583. The continuity requirement does not, in itself, require that every member "be involved in each of the underlying acts of racketeering, or that the predicate acts be interrelated in any way." *Qaoud*, 777 F.2d at 1116. Instead, the continuity requirement focuses on whether the associates' behavior was "ongoing" rather than isolated activity. *Patrick*, 248 F.3d at 19.

**[13]** The allegations of plaintiffs Odom and Moureaux-Maloney describe similar methods of fraudulently charging

Best Buy customers for MSN Internet accounts. Plaintiffs' allegations cover almost two years of conduct by Best Buy and Microsoft. An almost two-year time span is far more than adequate to establish that Best Buy and Microsoft functioned as a continuing unit. That several employees engaged in the activity at different times does not defeat the continuity requirement. *Cagnina*, 697 F.2d at 921 (holding that a growing membership and diversity of activities do not preclude a finding of "continuity").

### iv. Conclusion

Several courts of appeals have concluded that a broad definition of an associated-in-fact enterprise would produce undesirably expansive RICO liability. For example, when the Third Circuit in *Riccobene* required that an enterprise have a structure beyond that "necessary merely to commit each of the acts charged as predicate racketeering offenses," 709 F.2d at 224, it did so to avoid what it called the "dangers" of a broad definition. *Id.* at 221. The Third Circuit stated that it was concerned that RICO liability would extend "to situations far removed from those actually contemplated by Congress, and that federal prosecutors could use the law to invoke an additional penalty whenever they had a case involving the commission of two offenses that, coincidentally, were among those listed as 'racketeering activities.' " *Id.*

The answer to concerns like those expressed by the Third Circuit in *Riccobene* was given by the Supreme Court in *Sedima*, when it rebuked the Second Circuit for having interpreted RICO to avoid what the court of appeals had called the " 'extraordinary, if not outrageous,' uses to which civil RICO had been put." 473 U.S. at 499. The Court's response was to point to the text of the statute: "It is true that private civil actions under the statute are being brought almost solely against [legitimate] defendants, rather than against the archetypal, intimidating mobster. Yet this defect — if defect it is

— is inherent in the statute as written, and its correction must lie with Congress." *Id.* (footnote omitted).

**[14]** In *Turkette*, the Supreme Court carefully articulated the criteria for an associated-in-fact enterprise under RICO. We do not believe that we are at liberty to add to them. Applying the criteria articulated in *Turkette*, we conclude that plaintiffs have sufficiently alleged an associated-in-fact enterprise.

## 2. Pleading Fraud with Particularity

Federal Rule of Civil Procedure 9(b) requires that fraud be pled with particularity. It provides: "In all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Rule 9(b) "requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986) (internal quotation marks omitted) (quoting *Bosse v. Crowell Collier & MacMillan*, 565 F.2d 602, 611 (9th Cir. 1977)). "[T]he pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Id.* at 1401; *see also Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989). While the factual circumstances of the fraud itself must be alleged with particularity, the state of mind — or scienter — of the defendants may be alleged generally. *See In re Glen-Fed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547 (9th Cir. 1994) (en banc) ("We conclude that plaintiffs may aver scienter generally, just as the rule states — that is, simply by saying that scienter existed.").

**[15]** "[A] wire fraud violation consists of (1) the formation of a scheme or artifice to defraud; (2) use of the United States wires or causing a use of the United States wires in further-

ance of the scheme; and (3) specific intent to deceive or defraud." *Schreiber*, 806 F.2d at 1400 (citation omitted); *see also United States v. McNeil*, 320 F.3d 1034, 1040 (9th Cir. 2003). To the degree that the first requirement — the formation of a scheme or artifice to defraud — requires a showing of the defendants' state of mind, general rather than particularized allegations are sufficient. Similarly, the third requirement — specific intent to deceive or defraud — requires only a showing of the defendants' state of mind, for which general allegations are sufficient. The only aspects of wire fraud that require particularized allegations are the factual circumstances of the fraud itself.

Plaintiff Odom specifically alleges that he bought a laptop computer from a Best Buy store in Pleasant Hill, California, in May 2002; that he told the Best Buy employee when he purchased the computer that he did not need the Trial CD and the MSN service because he already had an Internet service provider; that the employee nevertheless scanned the Trial CD and swiped Odom's credit card, thereby sending the information to Microsoft by wire and establishing an account for Microsoft's MSN service without his knowledge or permission; that Microsoft billed him for two months of the MSN service that had been provided without his knowledge or permission; and that he has not been compensated for his losses. Odom does not allege the name of the Best Buy employee who sold him the computer and established his MSN account.

Plaintiff Moureaux-Maloney specifically alleges that she bought a cell phone and a cell phone plan from a Best Buy store in Reno, Nevada, in September 2001; that the Best Buy employee scanned a Trial CD and swiped her debit card, thereby sending the information to Microsoft by wire and establishing an account for Microsoft's MSN service without her knowledge or permission; that Microsoft withdrew monthly MSN payments from her debit card account for seventeen months without her knowledge or permission; that Microsoft sent her a bill for monthly MSN services for April,

May, and June 2003 after Microsoft was unable to withdraw money from her debit card account; and that Microsoft has not compensated her for losses attributable to the seventeen months of withdrawals from her account, and has continued to bill her for the three-month period in 2003. Like Odom, Moureaux-Maloney does not allege the name of the Best Buy employee who sold her the cell phone and established her MSN account.

[16] The only arguable deficiency in Odom and Moureaux-Maloney's allegations of wire fraud is that the names of the individual Best Buy employee who established their MSN accounts are not alleged. We hold for two reasons that, in the circumstances of a retail transaction whose full consequences are realized only months later, the employee of the store need not be named. First, it is unrealistic to expect that the retail customer would remember the name of the cash register employee. A requirement that the employee be named as a precondition of bringing suit and commencing discovery would, as a practical matter, defeat almost any suit based on such a fraud. Second, as we noted above, Rule 9(b) "requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Schreiber,* 806 F.2d at 1400. In the circumstances of this case, we have been given no reason to believe that defendants will be hampered in their defense by Odom and Moureaux-Maloney's inability to name the particular employees.

[17] We therefore hold that plaintiffs' allegations of the circumstances of wire fraud are sufficiently particularized to satisfy the pleading requirements of Rule 9(b).

## IV. Conclusion

For the foregoing reasons, we hold that plaintiffs have sufficiently alleged the existence of an associated-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and

1962(c). We also hold that plaintiffs have alleged wire fraud with sufficient particularity to satisfy Rule 9(b). We therefore reverse the decision of the district court and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

---

SILVERMAN, Circuit Judge, with whom RYMER, TALLMAN, RAWLINSON, and BEA, Circuit Judges, join, concurring in the result:

I do not see how Odom's complaint successfully pleads an "enterprise" within the RICO statute.

The language in *Turkette* is the starting point. An "enterprise" is "a group of persons associated together for a common purpose," and is proven by "evidence of an ongoing organization, formal or informal" and "evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981).

Paragraph 34 of Odom's complaint alleges only the following with respect to defining the associated-in-fact "enterprise" element:

> Defendants's agreement that Microsoft will advertise and promote Best Buy and its online store on its MSN Internet access service and various Microsoft-owned Websites, while Best Buy will advertise and promote MSN service in its "bricks and mortar" and online stores, together with Defendants' activities in furtherance of the agreement, constitute an "enterprise" as defined in 18 U.S.C. § 1961(4).

Nothing in this paragraph fairly alleges an "ongoing organization" between Microsoft and Best Buy. It merely states that

the existence of a marketing contract and the performance of that contract by two parties constitute an enterprise. Stated differently, the Complaint assumes that if two parties perform a series of "predicate acts" for each other's benefit pursuant to a commercial agreement, they *ipso facto* constitute an "enterprise."

I cannot agree. RICO targets a more sophisticated crowd: those persons or entities associated in fact with "ongoing organization" — some minimal structure, coordination, or ordering principle to distinguish them from a run-of-the-mill conspiracy. *See Chang v. Chen*, 80 F.3d 1293, 1300 (9th Cir. 1996) ("A conspiracy . . . is not an enterprise for purposes of RICO."); *see also Turkette*, 452 U.S. at 589 (noting that the declared purpose of RICO was "to seek the eradication of *organized* crime" (emphasis added and citation omitted)). This distinction is highlighted in our cases and those of our sister circuits. *See, e.g.*, *United States v. Patrick*, 248 F.3d 11, 19 (1st Cir. 2001) (noting that the gang "had older members who instructed younger ones, its members referred to the gang as family, and it had 'sessions' where important decisions were made"); *United States v. Rogers*, 89 F.3d 1326, 1337 (7th Cir. 1996) (asking whether the enterprise has a structure "organized in a manner amenable to hierarchical or consensual decision-making" (citation and internal quotation omitted)); *Chang*, 80 F.3d at 1299 (asking whether the enterprise's "structure . . . provide[s] some 'mechanism for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis' " (quoting *United States v. Riccobene*, 709 F.2d 214, 222 (3d Cir. 1983)); *United States v. Perholtz*, 842 F.2d 343, 363 (D.C. Cir. 1988) ("The same group of individuals who repeatedly commit predicate offenses do not necessarily comprise an enterprise. An extra ingredient is required: organization.").

There is nothing in the complaint to suggest "ongoing organization" between Best Buy and Microsoft *after* the ink dried on their alleged agreement — no partnership, joint venture,

consultation, concerted action, or joint decision-making. On this score, Odom alleged nothing more than a contract and its performance. As a result, the district court correctly dismissed Odom's complaint.[1]

I reject the majority's reference to the alleged " 'coordinated' behavior of the two entities" — the transfer of customer financial information and other cross promotional activities between Microsoft and Best Buy — as satisfying the pleading requirement for "ongoing organization." *See* Maj. Op. at 4979-80. Odom's complaint narrowly defines the "enterprise" as only the marketing agreement between Best Buy and Microsoft together and their activities in furtherance of that agreement. It is not for us to buttress paragraph 34 with facts that Odom could have, but did not allege to define the "enterprise."

Nevertheless, I vote to reverse because the district court should have granted Odom leave to amend his complaint. When the district court hinted that it was thinking about dismissing the RICO claim, plaintiffs' counsel offered to "elaborate" on how the complaint could be amended to "plead within the statute," but the district court declined to entertain additional argument on the matter. Because there may be facts which if properly pled would satisfy the RICO "enterprise" element, and given Rule 15(a)'s mandate that "leave shall be freely given," the district court's failure to do so was error.

---

[1]To the extent the complaint alleges that decisions "are made by Defendants jointly," it does not allege that the joint decision-making was sufficiently systematic to constitute "ongoing organization" — some "system of authority that guide[s] the operation of the alleged enterprise" beyond the initial contract, *Chang*, 80 F.3d at 1300, or, as the Third Circuit has aptly put the point, a "mechanism for controlling and directing the affairs of the group on an ongoing, rather than an ad hoc, basis." *Riccobene*, 709 F.2d at 222.

BYBEE, Circuit Judge, joined by Judge REINHARDT, concurring:

It strikes me as outlandish that what Judge Silverman correctly describes as a "marketing contract" between Microsoft and Best Buy could subject them to a private RICO action. Slip Op. at 4986 (Silverman, J., concurring in the result). But my concerns were voiced and dismissed more than twenty years ago. *See Sedmina, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-99 (1985). I therefore join Judge Fletcher's opinion for the court.