**Jung Ja KIM, Plaintiff,**

v.

**RAMON K. QUICHOCHO, Law Offices of Ramon K. Quichocho, L.L.C., a limited liability company, Frances C. Quichocho, and Karissa, L.L.C., a limited liability company, and Does I through V, Defendants.**

**Civil No. 09–0046.**

United States District Court, D.N. Mariana Islands.

Jan. 24, 2011.

---

Colin M. Thompson, The Law Offices of Colin M. Thompson, Robert T. Torres, Law Office of Robert Tenorio Torres, Saipan, MP, for Plaintiff.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' SECOND MOTION TO DISMISS**

MARK W. BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ....................................................1217
 A. Factual Background ..........................................1217
 B. Procedural Background .......................................1220

II. LEGAL ANALYSIS ................................................1223
 A. Applicable Pleading Standards ...............................1223
 B. The Pleading Of A Pattern Of Racketeering Activity ..........1223
 1. Arguments of the parties ................................1223
 2. Analysis ................................................1223
 a. Predicate acts of wire fraud ........................1224
 b. Predicate acts of money laundering ..................1225
 c. Pattern of racketeering activity ....................1226
 d. Conduct or acquisition of control ...................1226
 3. Summary .................................................1227
 C. Additional Challenges To The RICO Conspiracy Claim ..........1227
 1. Pleading of an agreement among proper parties ...........1227
 2. Pleading of an agreement ................................1228
 D. The Pleading Of The Fraud Claim .............................1229

III. CONCLUSION ....................................................1231

This case involves claims that the defendants, including the plaintiff's attorney, have defrauded the plaintiff of two of her businesses, which own poker machines, under the guise of protecting her from litigation by her former husband and his family and helping her through a period of depression. In an amended complaint, the plaintiff asserts claims pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(b), (c), and (d); legal malpractice, in the form of professional negligence and breach of fiduciary duty; breach of lease agreements; conversion; common-law fraud; and constructive trust. This case is before the court on the defendants' second motion to dismiss, after the court granted the defendants' first motion to dismiss the RICO claims, but permitted the plaintiff to amend her complaint to attempt to address deficiencies. *See Kim v. Quichocho,* 708 F.Supp.2d 1079 (D.N.Mar.I.2010).[1] The

---

1. The undersigned resolved the defendants' first motion to dismiss as part of the undersigned's first assignment as a visiting judge to the District of the Northern Mariana Islands. The undersigned heard the defendants' sec-

defendants contend that the plaintiff has failed to follow the "road map" laid out by the court to cure deficiencies in the RICO claims and, despite notice of deficiencies in her common-law fraud claim, has failed to plead that claim with the necessary particularity. Therefore, the defendants seek dismissal with prejudice of the plaintiff's RICO and common-law fraud claims. The plaintiff asserts that the challenged claims are adequately pleaded.

## I. INTRODUCTION

### A. Factual Background[2]

According to the First Amended Complaint (docket no. 21), filed in this action on August 9, 2010, plaintiff Jung Ja Kim is a plaintiff of the Republic of Korea. The defendants are Ramon K. Quichocho, a citizen of the United States and a resident of the Commonwealth of the Northern Mariana Islands (CNMI); the Law Office of Ramon K. Quichocho, L.L.C. (Law Office), a limited liability company organized under the laws of the CNMI, through which Ramon provided legal services as a CNMI Bar licensed attorney; Frances C. Quichocho, a resident of the CNMI, wife of Ramon, and a member of the Law Office; and Karissa, L.L.C., a limited liability company organized under the laws of the CNMI with its principal place of business in the CNMI, through which Mrs. Quichocho rendered document handling, accounting, payroll, business, and legal support services.[3]

Other entities central to the claims in the First Amended Complaint are Latte Stone, L.L.C., a company allegedly formed in 2008 by the Quichochos for Kim's benefit to hide her true ownership interest from her former husband, and Tan Dingo, L.L.C., which was allegedly formed by the Quichochos and Joaquin Atalig, Ramon's uncle, in 2006, then purportedly transferred to Kim in 2008. Kim alleges, generally, that, after inducing her to purchase Tan Dingo and to transfer title of poker machines to Latte Stone, the Quichochos waited until Kim had transferred some twenty-six gaming machines to the company and paid taxes and license fees before denying her ownership interest. She alleges that this scheme was knowingly implemented by the Quichochos, by their affirmative conduct and material omissions concerning the creation of Tan Dingo and Latte Stone, by inducing her to transfer property to these entities on the pretext that her interests would be safeguarded and that she would possess an ownership interest, and then by deliberately denying

---

ond motion to dismiss as part of the undersigned's second assignment as a visiting judge.

2. As the court noted in its ruling on the first round of motions to dismiss, "[w]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Thus, the factual background presented here is based on the plaintiff's allegations in her First Amended Complaint (docket no. 21). The defendants acknowledge that the court must proceed as if these factual allegations are true, although they assert that the First Amended Complaint is salacious and scurrilous in many parts and alleges facts that are not true.

There appear to be several redundancies or overlapping allegations in Kim's pleading of the pertinent facts. The court has attempted not to duplicate those redundancies in its statement of the factual background for purposes of this ruling. The court has also omitted allegations that appear to go primarily or exclusively to causes of action not at issue in the defendants' second Motion To Dismiss now before the court.

3. Kim also named five "Doe" defendants, but admits that she is ignorant of the true, complete, and precise names and capacities of these defendants.

her any interest in these companies after her property had been transferred. She contends that the scheme was perpetrated through wire fraud and money laundering.

More specifically, Kim alleges that, in the middle of April 2008, she met with the Quichochos at Ramon's office in San Jose, Saipan, seeking assistance in forming a new business or purchasing one for the purpose of holding title to and operating for profit CNMI licensed poker machines. Kim explained that she intended to transfer CNMI licensed poker machines to the new business entity from other business entities that she and her daughter either owned or controlled. At the meeting, the Quichochos offered Kim Tan Dingo for this purpose, and represented that Ramon would "take care of it." However, Kim alleges that Ramon neither intended to nor did anything to "take care of it," and the Quichochos and Atalig remained the only members of Tan Dingo. Kim alleges that, as the result of Ramon's failure to disclose material information that he did not intend to resign from Tan Dingo but to remain a member, she lost control over any assets that she transferred to Tan Dingo, which she would not have transferred had she known she was not the owner of Tan Dingo. Kim alleges that, on or about May 15, 2010, in the Second Floor offices of the Law Firm in San Jose, Frances gave Kim all the records and books for Tan Dingo, including the bank book, blank checks, BGRT tax forms, the tax ID number, and the Articles of Organization, and told Kim that Tan Dingo was now Kim's company. Kim paid Frances $650.00 in cash for Tan Dingo. Although minutes of a meeting for Tan Dingo dated April 25, 2008, drafted by Frances in June 2008, stated that Kim was a member of Tan Dingo and that all members accepted Kim as a new member, Kim alleges these statements were false.

Kim also alleges that she became severely depressed in October 2008, apparently because of increasingly bitter litigation by her former husband and his brothers, and that the Quichochos were aware of her emotional condition. She alleges that she increasingly turned to the Quichochos for advice as her emotional condition declined. She alleges that, at the end of October 2008, at his office in San Jose, Ramon counseled Kim that "things are too hard to do alone," and advised her that, to "protect her and her assets" from her former husband's family's litigation and any other lawsuits, Kim should form another company that did not have her name attached to it. This company, she was told, would hold title to and operate her poker machines for her benefit. Kim alleges that the Quichochos, knowing Kim's emotional condition, advised and convinced her that she was in no condition to take on the pressures of running a business, that hiding her true ownership interest in the company was necessary for her protection, and that her husband's family would continue to cause problems if her name were associated with or appeared on company records and/or its bank account. She alleges that, on or about October 2008, the Quichochos formed Latte Stone, L.L.C., apparently for Kim's benefit. Records filed by the company list Frances as the only member. The Quichochos did not prepare any documentation confirming Kim's ownership of either Tan Dingo or Latte Stone.

On or about May 14, 2008, allegedly in reliance on the Quichochos' material representations and omissions, Kim "caused" eight poker machines to be transferred to Tan Dingo, for the below market price of $7,600, from Pacific Saipan, L.L.C., an entity owned by her daughter, Dan Bi Choi, and on or about May 16, 2008, Kim paid, by debit card, $60,000.00 to renew the license for five machines that she had transferred to Tan Dingo. However, neither Tan Dingo, Atalig, or the Quichochos

paid for these machines. Kim alleges that, in reliance on the Quichochos' representations and omissions, she transferred more poker machines to Tan Dingo: eight on or about July 10, 2008, and ten on or about October 7, 2008.

Kim alleges that she relied on the Quichochos to act as her trustees and for her benefit to collect revenues from poker machines transferred to Latte Stone, for operation as Latte Poker Room on Rota, relying on their false promises that Latte Stone was their business in name only. She also alleges that, on or about October 26, 2008, in reliance on the Quichochos' representations and omissions, she transferred ten poker machines belonging to Tan Dingo to Latte Stone, along with air conditioners, keys, a generator, a computer system, office supplies, and cash; that she transferred one poker machine from Tan Dingo to Latte Stone on November 10, 2008; and that she then transferred nine additional poker machines to Latte Stone (although it is not clear from what entity) on November 10, 2008. She alleges that Latte Stone did not pay for these machines. She also alleges that, on November 14, 2008, she "caused" ten poker machines to be shipped by air cargo from Saipan to Rota for Latte Stone to commence operations, and that she paid for this shipping by electronic debit card.

Kim also alleges that, in reliance on the Quichochos' representations and omissions, she paid, by means of interstate wire, additional license fees for poker machines transferred to Latte Stone or Tan Dingo, including $80,000 on November 17, 2008. She also alleges that, on or about November 17, 2008, she made contributions for signs, transportation and hotel costs, furniture and fixtures, and other improvements. She alleges, further, that she purchased the materials and drinks necessary to set up Latte Stone for operation as Latte Poker Room on Rota and that, between November 2008 and January 2009, by debit card, she paid for air transportation to and hotel expenses in Rota for the Quichochos, assigned and paid for employees of her company to travel to Rota, and brought her technician, Mr. Cui, sign board designer, Mr. Kim, and her brother to Rota to set up the establishment. She also alleges that, on unspecified occasions, the Quichochos induced Kim to remit, by means of interstate wire transactions, funds to pay for airline tickets and lodging for their travel to Rota, purportedly for purposes of setting up, monitoring, or acquiring assets for Latte Stone.

Kim apparently became concerned about the status of Tan Dingo and Latte Stone in early 2009. She alleges that, in February 2009, she sought a meeting with Frances to discuss the state of these companies, but Frances refused to meet with her and, instead, demanded that all Tan Dingo documents be delivered to her care and custody. Kim alleges that she then had a meeting with Ramon on February 24, 2009, at which Ramon allegedly falsely told her that he knew nothing about Latte Stone and could not do anything about that company, because his wife was involved with it, not him. Apparently at that meeting, Kim asked Ramon to provide her with an accounting for Latte Stone and Tan Dingo and to restore her name to the ownership records for those companies. However, she alleges that, instead, Ramon flew to Rota that same day, fired her employee, and left word with the remaining worker that, if Kim and/or her worker entered the premises in which Latte Stone was operating, he was to call the police.

Kim alleges that she attended a limited liability company meeting of Tan Dingo on March 23, 2009, accompanied by her counsel, at which Atalig, Ramon, and Frances were all present. She alleges that, at that meeting, she objected to the Quichochos'

"theft" of her right to ownership in the business and profits of Tan Dingo, but the Quichochos took the position that Kim was only a "minority member," because she had not filed any certificate of her financial contribution to Tan Dingo and there was "confusion" about the number of shares that she had been issued.

Kim also alleges that the Quichochos, through Latte Stone, have intentionally conducted and continue to conduct financial transactions by regularly depositing the money generated by Latte Stone into the Bank of Guam, a bank insured by the FDIC. She alleges that the deposited money was the proceeds of the Quichochos' prior acts of wire fraud that victimized her, that the Quichochos knew that the property represented the proceeds of prior acts of wire fraud, and that the Quichochos acted with the intent to promote the carrying on of their wire fraud. Kim alleges, further, that by depositing funds into the Bank of Guam account in the name of Latte Stone, the Quichochos were able to conceal or disguise the source and ownership of the funds generated by CNMI licensed poker machines that the Quichochos wrongfully acquired from her through the wire fraud scheme. She then alleges that several specific financial transactions using Latte Stone's bank account were conducted in order to promote the conversion of the proceeds that the Quichochos had acquired through the wire fraud. Those transactions included the following: payments to a house worker; payments for water and ice for the Quichochos' residence and law office; payments to Frances; payments to Isla Financial, an unrelated business; a payment to the legal secretary for the law office; and payments to Frances's daughter from a previous marriage.

Kim alleges that Latte Stone reported total revenues of $19,380.75 for the year ending on December 31, 2008, and $247,397.25 for the year ending on December 31, 2009. Kim alleges, on information and belief, that Latte Stone Poker is earning upwards of $30,000 monthly, but that, despite demands, the Quichochos, have failed and refused to distribute any funds to Kim. Kim also alleges that Tan Dingo's Annual Limited Liability Company Report for the year 2008, dated March 6, 2009, and filed by Frances with the CNMI Department of Commerce on March 11, 2009, lists Joaquin Q. Atalig as a member owning 40% of the company, Ramon Quichocho as a member owning 26% of the company, Frances C. Quichocho, as a member owning 25% of the company, and Jung Ja Kim as a member owning 9% of the company "pending confirmation of contribution."

### B. Procedural Background

Kim filed her original Complaint (docket no. 1) in this action on December 18, 2009, asserting nine claims for relief: acquisition by the Quichochos of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(b); conduct of an enterprise by the Quichochos through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c); RICO conspiracy by all defendants, in violation of 18 U.S.C. § 1962(d); legal malpractice by Ramon and the Law Office resulting from professional negligence; legal malpractice by Ramon and the Law Office resulting from breach of fiduciary duty; breach of lease agreements by the Quichochos and the Law Office; conversion by the Quichochos; fraud; and creation of a constructive trust by the Quichochos.

On January 28, 2010, the defendants filed their Notice Of Motion And Motion to Dismiss (docket no. 4), seeking dismissal of Kim's first, second, and third claims for relief, *i.e.*, her RICO claims, for failure to state claims upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and fail-

ure to plead fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. The defendants conceded, however, that Kim had arguably pleaded causes of action for malpractice, breach of lease, and conversion, assuming *arguendo* that Kim's allegations are true. Although the defendants did not seek dismissal of Kim's eighth claim, for common-law fraud, they did give notice, in a footnote to their supporting brief, that they believed that, for the same reasons that fraud had not been properly pleaded with regard to the RICO claims, it had not been properly pleaded with regard to the common-law fraud claim. They added that, if their motion was granted, and Kim did not withdraw the common-law fraud claim, they would file another motion to dismiss and a motion for sanctions under Rule 11 of the Federal Rules of Civil Procedure. On March 22, 2010, Kim filed her Opposition to Defendants' Motion to Dismiss Racketeer Influenced Corrupt Organizations Act Claims (docket no. 10). The defendants then filed their Reply (docket no. 11) on April 12, 2010.

The court heard oral arguments on the defendants' first Motion To Dismiss on April 15, 2010, during the undersigned's first assignment to the District of the Northern Mariana Islands as a visiting judge. On April 20, 2010, in a Memorandum Opinion And Order Regarding Defendants' Motion To Dismiss Counts 1 Through 3 (docket no. 13), *see Kim v. Quichocho,* 708 F.Supp.2d 1079 (D.N.Mar. I.2010), the court granted the defendants' first Motion To Dismiss, but granted Kim leave to amend her RICO claims. The court cautioned that, if Kim failed to amend her Complaint within ninety days, the RICO claims in her Complaint would be dismissed without prejudice.

Somewhat more specifically, in its ruling on the defendants' first Motion To Dismiss, the court chastised Kim for her "shotgun" pleadings, which, for example, incorporated allegations asserted in support of Kim's RICO claims into her non-RICO claims, but the court declined to order a repleader *sua sponte,* or to disregard factual allegations so incorporated, as the defendants requested. Instead, the court cautioned Kim that, if she was allowed to amend her complaint, she was on notice of the court's concerns with "shotgun" pleadings.

As to Kim's claim of acquisition of an enterprise through a pattern of racketeering activity, in violation of 15 U.S.C. § 1962(b), the court found that Tan Dingo and Latte Stone are "enterprises" within the meaning of § 1961(4), so that the claim did not fail for failure to allege a RICO enterprise; that Kim's allegations that Tan Dingo and Latte Stone affected interstate commerce were sufficient; and that Kim's allegations that she was a "person" under RICO, that the defendants' activity led to the control of the asserted RICO enterprises, and that she was injured were all sufficient. However, the court concluded that Kim's allegations of a pattern of racketeering activity were inadequate. Specifically, the court found that, although Kim had alleged use of the wires in furtherance of an alleged fraud scheme, she had failed to allege sufficient details, for example, concerning the approximate time when Kim was induced to use a wire or actually used a wire, the factual circumstances concerning the place or manner in which the wires were used, or how she was actually induced to use the wires on any occasion. Similarly, the court found that Kim's allegations of money laundering were deficient, because Kim had not adequately alleged a predicate offense for the money laundering allegation. In short, the court concluded that, having not properly alleged wire fraud, money laundering, or any other specified unlawful activity under RICO, Kim had not successfully asserted a

predicate act of racketeering under section 1962(b). As to Kim's claim of conduct of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), the court concluded that Kim had plausibly alleged that the Quichochos participated in the operation or management of Tan Dingo and Latte Stone. The court concluded, however, that Kim had not adequately alleged that they had done so through a pattern of racketeering activity, because she had failed to allege adequately predicate acts of wire fraud or money laundering. The court then concluded that Kim's claim of a RICO conspiracy, in violation of 18 U.S.C. § 1962(d), must also fail, because Kim did not adequately plead a substantive violation of RICO.

Finally, the court determined that Kim was entitled to amend her complaint as a matter of course, as a responsive pleading had not yet been served, citing *Schreiber Distributing Co. v. Serv–Well Furniture Co., Inc.*, 806 F.2d 1393, 1401 (9th Cir. 1986). Moreover, the court concluded that Kim's RICO claims were insufficient owing to her failure to meet Rule 9(b)'s specificity requirement, but such a deficiency can potentially be cured. Therefore, the court declined to dismiss Kim's RICO claims with prejudice and, instead, granted Kim leave to amend her RICO claims within ninety days.

The court subsequently extended Kim's deadline to file an amended complaint and granted her leave to conduct limited, expedited discovery concerning all bank records for Latte Stone, L.L.C.; all Bank of Guam records relating to a particular checking account; all financial statements for Latte Stone, L.L.C.; and a full accounting for Latte Stone, L.L.C., and Tan Dingo, L.L.C. *See* June 29, 2010, Order Regarding Motion For Expedited Discovery (docket no. 20). Kim eventually filed her First Amended Complaint (docket no. 21), attempting to cure deficiencies identified in her original Complaint, on August 9, 2010. Kim's First Amended Complaint asserts the same nine causes of action, against the same defendants, as her original Complaint, albeit in considerably recast form.

On September 17, 2010, the defendants filed the motion now before the court, their Motion To Dismiss The First, Second, Third, And Eighth Claims For Relief (docket no. 25), that is, Kim's RICO and common-law fraud claims. Pursuant to the parties Stipulation (docket no. 27), the court granted Kim to and including October 25, 2010, to file her response to the defendants' second Motion To Dismiss, granted the defendants to and including November 9, 2010, to file any reply, and set oral arguments on the defendants' second Motion To Dismiss for November 12, 2010, during the undersigned's second assignment to Saipan as a visiting judge. *See* Order (docket no. 29). Kim did, indeed, file her Opposition To Defendants' Motion To Dismiss First, Second, Third, And Eighth Claims Of First Amended Complaint (docket no. 30) on October 25, 2010, and the defendants filed their Reply (docket no. 32), by leave of court, on November 10, 2010.

The oral arguments on the defendants' motion were rescheduled for November 17, 2010, owing to scheduling conflicts that unexpectedly arose after the undersigned arrived in Saipan. At the oral arguments, plaintiff Kim was represented by Colin Thompson of the Law Office of Colin M. Thompson in Saipan and Robert Torres of the Law Office of Robert Tenorio Torres in Saipan, and the defendants were represented by Michael Dotts of O'Connor Berman Dotts & Banes in Saipan. Once again, the oral arguments were illuminating. At the conclusion of the oral arguments, this matter was fully submitted.

Unfortunately, the intervening holidays and the backlog of other work upon the undersigned's return to the mainland have delayed disposition of the defendants' second Motion To Dismiss somewhat longer than the undersigned intended.

## II. LEGAL ANALYSIS

### A. Applicable Pleading Standards

 The court set out the standards for disposition of a Rule 12(b)(6) motion to dismiss and the standards for pleading fraud with the particularity required by Rule 9(b) in some detail in its prior ruling in this case. *See Kim,* 708 F.Supp.2d at 1087–89. The court will not reiterate those standards in their entirety here. Rather, suffice it to say that Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal for "failure to state a claim upon which relief can be granted," FED.R.CIV.P. 12(b), and that "[a] complaint may survive a motion to dismiss if, taking all well-pleaded factual allegations as true, it contains 'enough facts to state a claim to relief that is plausible on its face.'" *Coto Settlement v. Eisenberg,* 593 F.3d 1031, 1034 (9th Cir.2010) (quoting *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), in turn quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Rule 9(b) provides, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED.R.CIV.P. 9(b). Thus, the pleader must state the time, place, and specific content of the false representations, as well as the identities of the parties to the misrepresentation, but the state of mind—or scienter—of the defendants may be alleged generally. *Odom v. Microsoft Corp.,* 486 F.3d 541, 553–54 (9th Cir.2007). Rule 9(b) standards apply to RICO claims. *Moore*

*v. Kayport Package Exp., Inc.,* 885 F.2d 531, 541 (9th Cir.1989).

The court will apply these standards to each of the challenged claims in Kim's First Amended Complaint below.

### B. The Pleading Of A Pattern Of Racketeering Activity

#### 1. Arguments of the parties

The defendants assert that Kim's repleaded RICO claims still fail to plead either predicate RICO offenses or a pattern or racketeering activity, because Kim has not followed the "roadmap" for repleading her RICO claims laid out for her in the court's prior order. Instead, they assert that, once again, Kim alleges predicate RICO offenses in insufficient detail—as to circumstances of the alleged fraud and use of the wires in furtherance of it, to plead wire fraud, or anything other than lawful deposit of funds, not laundering of funds from wire fraud, to plead money laundering—and that she alleges a "pattern of racketeering activity" in only a general and formulaic manner. They also contend that Kim must allege injury from acquisition or control of an interest in a RICO enterprise, but Kim has not done so, instead alleging only injury from predicate offenses. Kim asserts that she has repleaded her RICO claims in sufficient detail.

#### 2. Analysis

Each of the plaintiff's RICO claims requires adequate pleading, and eventual proof, of predicate RICO offenses and a pattern of racketeering activity involving those predicate offenses as the means for conducting or acquiring control of a RICO enterprise. *See, e.g., Sanford v. Member-Works, Inc.,* 625 F.3d 550, 557 (9th Cir. 2010) ("To state a claim under § 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Odom v. Microsoft*

Corp., 486 F.3d 541, 547 (9th Cir.2007) (en banc). A 'pattern' ... requires at least two acts of racketeering activity. 18 U.S.C. § 1961(5). '[R]acketeering activity' is any act indictable under several provisions of Title 18 of the United States Code, and includes the predicate acts of mail fraud, wire fraud and obstruction of justice." (internal quotation marks and citations omitted)); *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir.2008) (stating that § 1962(d) prohibits a conspiracy to violate §§ 1962(b) and (c) and that "[a] 'pattern of racketeering activity' requires at least two predicate acts of racketeering activity, as defined in 18 U.S.C. § 1961(1), within a period of ten years. 18 U.S.C. § 1961(5)."); *Schreiber Distributing Co. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1398–99 (9th Cir.1986) ("Section 1962(b) makes it unlawful to acquire an interest in or control of an enterprise through a pattern of racketeering activity."). The court concludes that, while not perfect, Kim's First Amended Complaint sufficiently alleges these requirements of her RICO claims.

### a. Predicate acts of wire fraud

As to wire fraud, Kim asserts that she has alleged the circumstances of such predicate offenses with the required particularity and in accordance with the court's "roadmap." She summarizes the pertinent parts of her pleadings, as follows:

In the middle of April 2008, (time), at the offices of Mr. Quichocho in San Jose, (place) both Mr. and Mrs. Quichocho (parties) falsely told Ms. Kim (parties) that they would transfer the Tan Dingo to her (content). [First Amended Complaint,] ¶¶ 24–27. Soon after this meeting and prior to May 15, 2008, (time) Mr. Quichocho (party) confirmed the availability of Tan Dingo LLC for Ms. Kim and assured Ms. Kim (party) that the Tan Dingo could be used by Ms.

Kim. The Quichochos (parties) represented that they and Atalig would not interfere with Ms. Kim's ownership and control of Tan Dingo (content). ¶ 31 On or about May 15, 2010, (time) in the Second Floor offices of the San Jose building, (place) Frances Quichocho gave to Ms. Kim all the records and books for Tan Dingo LLC including the bank book, blank checks, BGRT tax forms, the tax ID number for Tan Dingo and the Articles of Organization. Mrs. Quichocho (party) told Ms. Kim (party) as she delivered the Tan Dingo files that this was now Ms. Kim's company (content). ¶ 33. In June 2008, (time) Mr. Quichocho drafted Minutes ... [which] falsely stated that Ms. Kim was a member of Tan Dingo. The Minutes falsely stated that all members accepted Ms. Kim as a new member of Tan Dingo.(content). ¶ 38. During this time period, Mr. Quichocho was Ms. Kim's attorney (parties and time). ¶ 10. Mr. Quichocho (party) had a duty to inform Ms. Kim (party) that he did not intend to resign from Tan Dingo, but instead intended to remain a member with the result being that Ms. Kim would lose control over any asset she transfer[red] to Tan Dingo. Mr. Quichocho's (party) failure to disclose these facts were material omissions (content). ¶ 29 At the end of October 2008 (time) at his office in San Jose, (place) Quichocho counseled Ms. Kim that "things are too hard to do alone" (content). At that time, (time) Quichocho advised Ms. Kim (parties) that to "protect her and her assets" from the Choi family's litigation and any other lawsuits, Ms. Kim should form another company that did not have her name attached to it. This company, she was told, would hold title and operate her poker machines for her benefit (content). ¶ 46. According to the Quichochos, Choi's family would continue to

cause problems if Ms. Kim's name were associated with or appeared on company records and/or its bank account (content). ¶ 47. During this time period, Mr. Quichocho was Ms. Kim's attorney (parties and time). ¶ 10. Quichocho (party) failed to meet his professional obligation to advise Ms. Kim (party) in writing of the potential for a conflict of interest in the Latte Stone Poker venture or the desirability of seeking the advice of independent legal counsel (content). [¶] 50. Quichocho's omissions were material causing Ms. Kim to transfer her property to companies that she did not own or control and thereby losing her property and the income derived from the poker machines (content). ¶ 53.

Plaintiff's Brief (docket no. 30) at 12–13. The court concludes that these allegations are sufficient to meet the particularity requirements that Kim's original Complaint failed to meet. Memorandum Opinion at 35–36; *Kim,* 708 F.Supp.2d at 1099–1100.

Kim also contends that she has adequately alleged that the false statements and omissions have the natural tendency to influence, and did influence her, because they "caused" her to engage in certain conduct, in reliance on them, including transferring and purchasing property for Tan Dingo and Latte Stone, paying for the Quichochos' travel and accommodation expenses, and devoting other personnel and resources to the enterprises. She contends that she was only required to allege, generally, the defendants' intent to defraud, and that she has done so. Finally, she contends that her allegations of use of the wires in furtherance of the fraud are sufficient, because she must only allege that use of the wires was reasonably foreseeable, even if not specifically intended. She contends that her allegations that she purchased poker machine licenses and shipped such machines to Rota using a debit card on certain dates meet the "use of the wires" pleading requirement. The

court agrees, where Kim has now pleaded more specifically the dates on which she engaged in such debit card transactions and the purposes of the transactions, even if she has not alleged all of the information that the defendants' might have desired. *See, e.g., Odom,* 486 F.3d 541 at 554–55 (plaintiff alleging wire fraud as a predicate RICO offense did not have to plead the name of the particular employees involved in a transaction, where there was no reason to believe that the defendants would be hampered in their defense by the plaintiff's inability to do so).

Thus, the court concludes that wire fraud, as a predicate act of racketeering activity, has now been pleaded in a way that meets the heightened particularity requirements of Rule 9(b). *Compare* Memorandum Opinion at 36–37; *Kim,* 708 F.Supp.2d at 1100–01.

### *b. Predicate acts of money laundering*

The defendants contend that the allegations of money laundering, as predicate RICO offenses, are inadequate, because they allege only deposit of funds from Latte Stone or Tan Dingo. Kim argues that the allegations of money laundering incorporate the underlying acts of wire fraud, so that she has not simply alleged deposits of funds from Latte Stone or Tan Dingo, but deposits of funds obtained by wire fraud. Specifically, she contends that she has clearly alleged, for example, in ¶ 78 of her First Amended Complaint, that the Quichochos intentionally conducted financial transactions by regularly depositing the proceeds of their wire fraud into the Bank of Guam, and that the proceeds were derived from the operation of Latte Stone Poker. She also contends that the wire fraud allegations clearly demonstrate that the Quichochos knew that the money flowing from the poker machines rightfully belonging to her were the proceeds of wire fraud. Next,

she asserts that she has adequately alleged that the defendants intended to promote the carrying on of the wire fraud by "plowing back" the proceeds of the fraud into Latte Stone. Finally, she contends that she has adequately pleaded that the Quichochos used financial transactions to conceal the ownership and control of her property by alleging that they used the proceeds of Latte Stone acquired by wire fraud to pay other expenses unrelated to that business.

As noted in the Memorandum Opinion, allegations of money laundering must, *inter alia*, allege that the identified financial transactions involved proceeds of specified illegal activity and that the transactions were intended either to promote the illegal activity or to conceal the nature, source, or ownership of the illegal proceeds. Memorandum Opinion at 38, *Kim*, 708 F.Supp.2d at 1101 (citing *United States v. Marbella* 73 F.3d 1508, 1514 (9th Cir.1996)). The court agrees with Kim that she has now pleaded financial transactions involving proceeds of wire fraud, where she has now adequately pleaded predicate acts of wire fraud. While the court is sympathetic to the defendants' contention that there is no concealment of funds, where the funds are traceable to a subsequent transaction, the court nevertheless concludes that Kim has now adequately pleaded that the purported money laundering was to promote the illegal activity of wire fraud.

Thus, the court concludes that Kim has also now adequately pleaded predicate offenses of money laundering. *Compare* Memorandum Opinion at 38–39, *Kim*, 708 F.Supp.2d at 1101–02.

#### c. *Pattern of racketeering activity*

▬ In the Memorandum Opinion, the court held that Kim had not alleged a pattern of racketeering activity, where she had failed to allege adequately any predicate acts. Memorandum Opinion at 42–43, *Kim*, 708 F.Supp.2d at 1104. In contrast, the court concludes that Kim's First Amended Complaint does allege predicate acts of wire fraud and money laundering. A "pattern" of racketeering activity requires two or more racketeering acts from the list in 18 U.S.C. § 1961(1), which includes money laundering and wire fraud. *See* 18 U.S.C. § 1961(5). However, two "isolated" acts may not be sufficient to constitute a pattern. *Schreiber Distrib. Co.*, 806 F.2d at 1399. Rather, some "continuity plus relationship" produces the required "pattern." *Id.* The court concludes that Kim has not only adequately alleged predicate acts, but a pattern of those acts, because the predicate acts alleged also have in common the same or similar purposes, results, participants, victims, and methods of commission, *cf. id.*, for example, in that they are all alleged to be in furtherance of the purpose of defrauding Kim of control or ownership of Tan Dingo and Latte Stone. Thus, the court concludes that Kim has now alleged the necessary pattern of racketeering activity.

#### d. *Conduct or acquisition of control*

▬ The defendants also contend that Kim must allege injury from acquisition or control of an interest in a RICO enterprise, but she has only alleged injury from predicate offenses. As to this issue, Kim argues that the First Amended Complaint adequately alleges that, from April 2008 to the present day, the defendants have obtained control over her poker machines and all of the profits that they generate; that they continue to operate the business as if they owned it; and that they continue to spend the Latte Stone profits as if those profits were their money. She contends that she has alleged sufficient "continuity" of the criminal activity, because the First Amended Complaint describes a scheme to defraud and launder money that began in April 2008 and that continues through the present day. Specifically, it alleges that

Latte Stone realizes income from Kim's property every day; that Latte Stone reported total revenues of $19,380.75 for the year ending on December 31, 2008 and $247,397.25 for the year ending on December 31,2009; that Latte Stone Poker is earning upwards of $30,000 monthly; but that the Quichochos, despite demand, have failed and refused to distribute any funds to Kim. Kim argues that, clearly, the scheme has been in existence for more than a year and is continuing today as a regular way of doing business. She also argues that she has alleged that there is a threat of future repetition since the Quichochos still control the enterprises that hold title to her property and still control the revenues from those machines. Thus, she contends that, given past experience, as pleaded, there is a strong likelihood that the defendants will continue to engage in a pattern of racketeering activities.

While the defendants read the First Amended Complaint as only alleging injury from predicate acts, not injury from acquisition or control of Tan Dingo and Latte Stone, the court does not believe that the defendants' reading is the only reasonable or plausible one. Indeed, the court agrees with Kim that the First Amended Complaint does repeatedly allege that, as a result of the defendants' misconduct, the defendants have obtained, and Kim has lost, ownership and control of Tan Dingo and Latte Stone.

### 3. Summary

Because the court concludes that Kim has cured the prior deficiencies and defeated the defendants' new challenges to her RICO claims pursuant to § 1962(b) and § 1962(c), the defendants' motion to dismiss those claims with prejudice will be denied. However, the defendants level additional challenges against Kim's RICO conspiracy claim, pursuant to § 1962(d), which require further analysis.

### C. Additional Challenges To The RICO Conspiracy Claim

The defendants argue that, apart from other deficiencies with all of Kim's RICO claims, addressed above, Kim's RICO conspiracy claim also fails to allege an agreement to violate RICO and alleges only an improper conspiracy between a corporation and its officers. Kim did not address either of these issues directly in her written opposition. For reasons that will become clear, the court will consider the defendants' additional challenges to the pleading of the RICO conspiracy claim in reverse order.

### 1. Pleading of an agreement among proper parties

The defendants argue that a corporation and its officers cannot conspire with each other for purposes of a RICO violation, but that is all that Kim has alleged here. They assert that Kim's inclusion of unnamed defendants does not cure this defect. Kim did not respond to this argument in her written opposition. However, at oral arguments, Kim asserted that she had previously briefed the issue of whether Ninth Circuit law permitted allegations of a RICO conspiracy between a corporation and its officers, because they are separate entities, even if the court did not reach that issue in its prior ruling. At oral arguments, the defendants argued that, while a corporation's president could presumably conspire with the corporation's chief financial officer, it is not enough to allege that everybody conspired with everybody else.

The court's review of Kim's opposition to the defendants' prior motion to dismiss reveals that the case on which Kim relied is *Neibel v. Trans World Asssur. Co.,* 108 F.3d 1123, 1129 (9th Cir.1997), *overruled on other grounds, United States v. Fernandez,* 388 F.3d 1199 (9th Cir.2004). The

decision in *Neibel* does state that, subsequent to the jury verdict in that case, "we held that '[section] 1962(d) applies to intracorporate conspiracies.'" *Neibel,* 108 F.3d at 1129 (quoting *Webster v. Omnitrition Int'l,* 79 F.3d 776, 787 (9th Cir.), *cert. denied,* 519 U.S. 865, 117 S.Ct. 174, 136 L.Ed.2d 115 (1996)). The defendants did not try to distinguish or even cite *Neibel* in their current motion to dismiss in their reiteration of their contention that Kim's RICO conspiracy claim alleges only an improper intracorporate conspiracy. The *Neibel* decision does support Kim's assertion that a RICO conspiracy claim could rest upon allegations that Karissa and the Law Office conspired with the Quichochos. The question, addressed below, is whether she has actually pleaded such an agreement.

## 2. *Pleading of an agreement*

As to the allegations of an agreement, the defendants contend that Kim has alleged an illegal agreement only in conclusory terms, and where she has been more specific, she has not alleged an agreement to violate §§ 1962(b) and 1962(c), but an agreement to provide services and support to Latte Stone and Tan Dingo. Kim did not address this argument directly in her written opposition, where she argued only that she has cured the defect with her RICO conspiracy claim identified in the court's prior ruling, which was failure to plead adequately predicate RICO offenses.

■■ The Ninth Circuit Court of Appeals has explained that, "[t]o establish a violation of section 1962(d), Plaintiffs must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard v. Am. Online Inc.,* 208 F.3d 741, 751 (9th Cir.2000). A claim of RICO conspiracy may rest on evidence (and presumably at the pleading stage, allegations) that

the defendant knew about and agreed to facilitate conduct that violated RICO. *See United States v. Fiander,* 547 F.3d 1036, 1041 (9th Cir.2008) (citing *Salinas v. United States,* 522 U.S. 52, 66, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997)). "A RICO conspiracy requires the assent of each defendant who is charged, although it is not necessary that each conspirator knows all of the details of the plan or conspiracy." *Baumer v. Pachl,* 8 F.3d 1341, 1346–47 (9th Cir.1993) (internal quotation marks and citations omitted). "Bare allegations" are not enough if they provide no basis to infer assent to contribute to a common enterprise. *Id.*

■ The RICO conspiracy claim here is, at best, poorly drafted. The question, however, is whether the claim is inadequately, not just inartfully, pleaded. The RICO conspiracy claim incorporates by reference factual allegations of wire fraud and money laundering. It then alleges that defendant Karissa "violated 18 U.S.C. § 1962(d)" by agreeing to provide support services to Latte Stone and Tan Dingo and facilitating funds transfers and conduct of others who operated these enterprises in an illegal manner. Similarly, it alleges that the Law Office also "violated 18 U.S.C. § 1962(d)" by facilitating transfer to and acquisition of assets by Tan Dingo and Latte Stone and conduct of others who operated these enterprises in an illegal manner. Finally, it alleges that "Karissa and the Law Office LLC knew of the essential nature and scope of each enterprise and intended to participate in each by the acts alleged above," and that, "[i]n taking the actions alleged above, the Quichochos acted knowingly, consciously, and maliciously in violation of the Racketeer Influenced Corruption Act ('RICO'), 18 U.S.C. § 1962(b) [sic]." Thus, the First Amended Complaint alleges that Karissa and the Law Office agreed with someone

to provide services to Latte Stone and Tan Dingo, but it does not allege with whom, and it does not allege that the Quichochos agreed with anyone to do anything. The court also has not found any allegations that the Quichochos agreed with anyone to do anything in the incorporated factual allegations, either.

To put it another way, there may be inferences from the allegations of knowledge of and intent to join in illegal conduct and an agreement to facilitate such conduct *on the part of Karissa and the Law Office* that there was an agreement on the part of these entities to engage in predicate acts or substantive violations of RICO. *See Fiander,* 547 F.3d at 1041 (a claim of RICO conspiracy may rest on evidence (and presumably at the pleading stage, allegations) that the defendant knew about and agreed to facilitate conduct that violated RICO); *see also Howard,* 208 F.3d at 751; *Baumer,* 8 F.3d at 1346–47. With whom they made such an agreement is a mystery. One would have to guess that they allegedly agreed to do so with the Quichochos. Moreover, one would have to guess that the Quichochos agreed with anyone at all, because there is no express allegation that the Quichochos entered into any agreement at all. The only allegation is that they acted knowingly, consciously, and maliciously in violating a substantive provision of RICO. The allegations against the Quichochos do not even suggest that they agreed with anyone to facilitate conduct that violated RICO. *Compare id.; Howard,* 208 F.3d at 751; *Baumer,* 8 F.3d at 1346–47. In short, the RICO conspiracy claim fails to allege the necessary agreement and must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim.

The court cannot say, however, that Kim cannot show that allegations of other facts consistent with the challenged pleading could possibly cure the deficiency. *See Schreiber Distrib. Co. v. Serv-Well Furniture Co. Inc.,* 806 F.2d 1393, 1401 (9th Cir.1986). This is particularly so, where the court concluded, above, that she has now adequately pleaded her substantive RICO claims. Furthermore, the insufficiency of the pleading of the substantive RICO claims (owing to failure to allege adequately predicate RICO offenses) was the only ground on which the court previously dismissed Kim's RICO conspiracy claim, but the insufficiency of the pleading of the substantive RICO claims has now been cured. Under these circumstances, Kim will be given one more opportunity to amend her complaint to allege a RICO conspiracy claim.

## D. The Pleading Of The Fraud Claim

Finally, the defendants challenge the sufficiency of Kim's pleading of her common-law fraud claim. Kim argues that she has cured any perceived deficiencies in this claim in the specificity of the incorporated factual allegations. She did concede at oral arguments, however, that to the extent that the common-law fraud claim could be read to be against defendants Karissa and the Law Office, those defendants should be dismissed from that cause of action.

The Eighth Claim For Relief in the First Amended Complaint is expressly identified as "against Ramon and Frances Quichocho," and Karissa and the Law Office are not even mentioned in the allegations specific to that claim, ¶¶ 160–166. Thus, any inference that the common-law fraud claim was intended to be against Karissa, the Law Office, or any defendants other than the Quichochos, would have to arise from the factual allegations incorporated by reference in ¶ 159. In light of Kim's express concession, however, that no common-law fraud claim was intended against Karissa and the Law Office, the

claim will be dismissed as against those defendants.

The court agrees with the defendants that the allegations in ¶¶ 160 through 166 of the Eighth Claim For Relief, standing alone, utterly fail to plead fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. FED. R.CIV.P. 9(b); *Odom*, 486 F.3d at 553–54. The question is whether the incorporated factual allegations, from ¶¶ 6–83, do sufficiently plead the circumstances of the fraud.

The court found, above, that the paragraphs incorporated into the common-law fraud claim do allege fraud with sufficient particularity, as the basis for a RICO predicate offense of wire fraud. The defendants contend, however, that the incorporated allegations only relate to representations about future events, such as protecting Kim from her husband in the divorce action and not interfering with Kim's ownership of Tan Dingo or Latte Stone, which the defendants assert cannot be the basis for a fraud claim under Commonwealth law. They cite *Benavente v. Marianas Public Land Corp.*, 2000 MP 13, 6 N.M.I. 136, 2000 WL 34601354, as standing for the principle that fraud cannot be predicated on statements that are promis-

sory in nature or that constitute expressions of intent. *See Benavente*, 2000 MP 13, ¶ 33, 6 N.M.I. at 145, 2000 WL 34601354 at *7 ("To be actionable, the alleged false representation must relate to a past or existing material fact, not the occurrence of a future event. *See TSA Intern., Ltd. v. Shimizu Corp.*, 92 Hawai'i 243, 990 P.2d 713 (1999). Fraud cannot be predicated on statements which are promissory in nature, or which constitute expressions of intent.").[4] However, even assuming that some of Kim's common-law fraud allegations are based on statements relating to the occurrence of a future event, the court finds that Kim has also alleged fraud based on representations as to then-current events. Such allegations include, for example, the allegation that, at the time that Frances gave Kim all the records and books for Tan Dingo, including the bank book, blank checks, BGRT tax forms, the tax ID number, and the Articles of Organization, Frances told Kim that Tan Dingo was now Kim's company, and the allegation of representations, in minutes of a meeting for Tan Dingo dated April 25, 2008, drafted by Frances in June 2008, that Kim was a member of Tan Dingo and that all members accepted Kim as a new member, which Kim alleges were false.[5] Also contrary to the defendants'

---

4. The court notes that this rule, for which the Commonwealth Supreme Court in *Benavente* cited decisions of the Hawaii Supreme Court without reference to the RESTATEMENT, appear to be in tension with the formulation of fraud law in the RESTATEMENT (SECOND) OF TORTS, which is otherwise recognized as the basis for Commonwealth tort law. Specifically, RESTATEMENT (SECOND) OF TORTS § 530 (1977) states that "[a] representation of a maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention." *See also Chung v. World Corp.*, 2005 WL 1459674, *3 (D.N.Mar.I.2005) (rejecting the defendant's argument that the plaintiff's fraud claim failed because it was based on a future promise of action, on the ground that the claim was premised on the

promise being made with no intention to perform it, citing *Agosta v. Astor*, 120 Cal.App.4th 596, 15 Cal.Rptr.3d 565, 569–70 (2004), and RESTATEMENT (SECOND) OF TORTS § 530). Resolution of this tension by certification of a proper question to the Commonwealth Supreme Court might ultimately be appropriate in this case.

5. Kim also alleges that representations by Ramon, which the defendants assert were only representations about future events, were made with the intent not to follow through on them. *See* RESTATEMENT (SECOND) OF TORTS § 530 (1977). Such a representation is that Ramon would "take care of" transferring Tan Dingo to Kim, but did not and did not intend to do so.

contentions, Kim has repeatedly pleaded that she relied on the Quichochos' misrepresentations, to her injury, in the form of loss of control of or proceeds from Tan Dingo and Latte Stone and assets from her other companies that she transferred to those entities.

Therefore, with the exception of dismissal of defendants Karissa and Law Office, the defendants' motion to dismiss Kim's common-law fraud claim in her Eighth Claim will be denied.

### III. CONCLUSION

Upon the foregoing, the defendants' September 17, 2010, Motion To Dismiss The First, Second, Third, And Eighth Claims For Relief (docket no. 25) is **granted in part and denied in part,** as follows:

1. The Motion is **denied** as to the First and Second Claims For Relief in Kim's First Amended Complaint, the RICO claims pursuant to 18 U.S.C. § 1962(b) and (c);

2. The Motion is **granted** as to the Third Claim For Relief in Kim's First Amended Complaint, the RICO conspiracy claim pursuant to 18 U.S.C. § 1962(d), but the dismissal of that claim is **without prejudice** to Kim's amendment of the claim within 30 days of this order to attempt to plead adequately the necessary agreement; and

3. The Motion as to the Eighth Claim For Relief in Kim's First Amended Complaint, the common-law fraud claim, is **granted** as to defendants Karissa and the Law Office, but **denied** as to defendants Ramon and Frances Quichocho.

**IT IS SO ORDERED.**