**IN RE: FIRST REGIONAL BANCORP, Debtor.**

**Vikaran Ghei and Michael Zaitzeff, Appellants**

v.

**Federal Deposit Insurance Corporation, as Receiver for First Regional Bank of California, Appellee.**

**Case No. 2:15–cv–4377–SVW**

**Bankruptcy No.:2:13–bk–31372–ER**

**Adversary Case No.: 2:14–ap–01221–ER**

United States District Court, C.D. California.

Signed 08/16/2016

Jon Lincoln Dalberg, Rodger Martin Landau, Landau Gottfried and Berger LLP, Los Angeles, CA, for Appellants.

John E. Walker, Sacro and Walker LLP, Glendale, CA, Sam J. Alberts, Dentons LLP, Washington, DC, for Appellee.

## ORDER AFFIRMING BANKRUPTCY COURT'S ORDER

STEPHEN V. WILSON, UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This is an appeal from the Bankruptcy Court's May 27, 2015 Amended Order Granting in Part and Denying in Part the Federal Deposit Insurance Corporation, as Receiver for First Regional Bank of California's ("FDIC–R's") Motion to Dismiss First Amended Complaint ("Amended Order"). (6–7 ER 131–266; 2:14–ap–01221–ER Dkt. 94.) At the heart of this appeal is (1) whether the First Amended Complaint ("FAC"), filed by Vikaran Ghei and Michael Zaitzeff (collectively, "Trustees"), contains sufficient facts to establish an implicit contractual agreement between First Regional Bancorp ("Debtor" or "Bancorp") and the First Regional Bank of California (the "Bank"), whereby the Bank's approximately $29,000,000 [1] in federal tax refunds (collectively, the "Refund") would be treated as property of Debtor's bankruptcy estate; and (2) whether the Bankruptcy Court erred by denying the FAC without leave to amend.

1. In Trustees' Opening Brief, Trustees state that the Bank collected approximately $27,042,061.65 in tax refunds (Opening Brief at 2), whereas in the FDIC–R's Answering Brief, the FDIC–R notes that it collected approximately $29,000,000 in tax refunds (Answering Brief at 1), which is consistent with its prior statement in its Motion to Dismiss the FAC that it received $27,042,061.65 on November 20, 2014 and an additional $2,801,845.62 on December 23, 2014. (6 ER 142.) The Court relies on the FDIC–R's statement, which the Bankruptcy Court also relied

## II. FACTUAL [2] AND PROCEDURAL BACKGROUND

### A. Background

Prior to its bankruptcy in 2012, Debtor and the Bank filed consolidated tax returns. (5 ER 101 ¶ 16.) Debtor's principal business was to serve as the holding company for the Bank, one of its subsidiaries. (5 ER 99 ¶ 1.)

In 2008, the Bank was in a compromised financial situation after incurring substantial losses in 2007 as a result of the deterioration of national economic conditions, including the decline of the Southern California real estate market. (5 ER 101 ¶ 15.) On January 29, 2010, the California Department of Financial Institutions closed the Bank and appointed the FDIC–R as the Bank's Receiver. (5 ER 99 ¶ 1.) Simultaneously, the FDIC–R assigned all of the Bank's deposits and certain of its other assets and liabilities to First Citizens Bank of Raleigh North Carolina ("FCB") through an asset purchase agreement with FCB. (5 ER 99 ¶ 2.) Since January 29, 2010, Debtor has been winding up its affairs. (5 ER 103 ¶ 3.)

Then, on June 19, 2012, Debtor filed a voluntary chapter 11 petition. (5 ER 99 ¶ 3.) On August 23, 2013, the Bankruptcy Court entered an Order Confirming Debtor's Second Amended Chapter 11 Liquidating Plan ("Plan"). (5 ER 99 ¶ 4.) Pursuant to the Plan, a Liquidating Trust

on in stating the relevant facts and procedural history in its Tentative Ruling granting in part and denying in part Debtor's Motion to Dismiss Trustees' FAC, which it adopted, as modified, as its April 9, 2015 Order ("Order"). (12 ER 328.)

2. The facts summarizing the proceedings and events leading up to the Bankruptcy Court's Order are taken from the Order. (12 ER 327–37; 13 ER 358–59.) The remaining facts are taken from Trustees' Opening Brief and excerpts of record.

("Liquidating Trust") was established and Trustees were appointed as the trustees of the Liquidating Trust to facilitate the liquidation of Debtor's assets. (5 ER 99–100 ¶¶ 4–5.) Substantially all of Debtor's assets were vested in the Liquidating Trust. (5 ER 99 ¶ 4.)

The FDIC–R, in its capacity as receiver for the Bank, filed amended tax returns on behalf of the Bank for the 2004, 2005, and 2006 tax years[3] (5 ER 103 ¶ 22), which Debtor initially filed on a consolidated basis.[4] (5 ER 100 ¶ 7.) These amended tax refunds offset the Bank's losses against its income and enabled the FDIC–R to claim substantial tax refunds of approximately $29 million. (Answering Brief at 1; 6 ER 142; 12 ER 328.) On December 3, 2012, the FDIC–R filed a proof of claim, designated claim number 18 ("FDIC–R POC"), relating in part to FDIC–R's right to the Refund. (5 ER 100 ¶ 6; 5 ER Ex. B at 120–21.)

On April 16, 2014, Trustees commenced the adversary proceeding against the FDIC–R by filing their initial complaint ("Initial Complaint"), which contained a counterclaim to the FDIC–R's POC seeking declaratory relief that the Liquidating Trust was entitled to the Refund.[5] (1 ER 1–14.) Trustees' Initial Complaint relied on an Affiliate Transaction Policy ("ATP"),

which Debtor adopted in July 2007. Trustees alleged that the ATP specified "the manner in which taxes associated with Consolidated Returns would be allocated and treated among ... Debtor and the Bank" and created a debtor-creditor relationship between Debtor and the Bank.[6] (1 ER 5 ¶ 17) Specifically, Trustees alleged that the ATP "allocates between ... Debtor and the Bank the benefits and burdens of taxes and/or refunds that may be or become owed and/or due in connection with such Consolidated Returns" and "does not create any trust running from ... Debtor to the Bank." (1 ER 6–7 ¶¶ 29–30.) Trustees seemed to implicitly suggest in Paragraphs 29–30 that because the Bank benefits from the ATP at Debtor's expense, it must also share any burdens associated with taxes and tax refunds, including sharing tax refunds attributable to its losses with Debtor. Trustees did not attach the ATP to their Initial Complaint or cite to specific provisions that established the alleged tax-sharing agreement between the parties. The ATP does not explicitly discuss how tax returns should be allocated between Debtor and the Bank and instead contains general policy statements, including the following:

- "It is the General Policy of ... [Debtor] to serve as a source of fi-

---

**3.** This was pursuant to the Worker, Homeownership, and Business Assurance Act ("WHBAA"), which Congress enacted on November 6, 2009 to allow businesses to "carry back net operating losses from 2008 and 2009 for up to five (5) years." (5 ER 103 ¶ 22.)

**4.** Typically, it is the parent of a consolidated group that must file the tax returns on behalf of the group. 26 CFR § 1.1502–77. However, as the FDIC–R explained in its Motion, it was permissible for the FDIC–R to file the amended tax returns under Treasury Regulation 301.6402–7(c)(1)(ii), which allows the Internal Revenue Service ("IRS") to "authorize the FDIC to act as agent for the [consolidated] group when one of the group's members

is an insolvent financial institution for which the FDIC has been appointed receiver." 26 CFR § 301.6402–7. (6 ER 141.) The IRS authorized the FDIC–R to act as an agent for the consolidated group. (*Id.*; 6 ER Ex. B at 168–69 ¶ 6B.)

**5.** Trustees asserted other claims in their Initial Complaint, which are not discussed here because they do not relate to the appeal. (1 ER 5–6; 1 ER 7–9.)

**6.** Despite relying almost exclusively on the ATP as the basis of the tax-sharing agreement, Trustees provided very little information about the implementation of the ATP.

nancial strength for its subsidiaries.... [Debtor] will do nothing to benefit itself financially at the expense of the financial condition of a subsidiary." (5 ER Ex. A at 112.)

- "Federal and State tax returns of ... [Debtor] and its subsidiaries are prepared on a consolidated basis in which ... [Debtor] is the taxpayer of record. Because each entity within ... [Debtor] generates a different amount of profit or loss, each is theoretically responsible for a portion of ... [Debtor's] overall tax expense. For example, the Bank typically generates a profit, while ... [Debtor] (on a stand-alone basis) typically incurs a loss. Were ... [Debtor] to collect the portion of the overall tax expense attributable to the Bank's profit from the Bank, this would be inconsistent with the General Policy, in that ... [Debtor] would not be serving as a source of financial strength for the Bank. In addition, timing differences occasionally arise between the time when profits (and the resulting taxes) are generated and the time when those taxes must actually be paid. Were ... [Debtor] to collect such taxes at the time they are generated and use the funds until the taxes are paid, this would also be inconsistent with the General Policy." (5 ER Ex. A at 112.)

- Debtor's "practice is to make all tax payments at the Bank level. In this way, the Bank maintains the possession and use of funds until the tax payments are actually made. In addition, this arrangement enables the Bank to benefit from tax losses which are incurred by ... [Debtor] or other First Regional subsidiaries. This practice results in a strengthening of the Bank's financial position, and thus is consistent with the General Policy." (5 ER Ex. A at 113.)

The ATP is undated and is not signed by either party. (5 ER Ex. A.)

On June 20, 2014, the FDIC–R filed a motion to dismiss the Initial Complaint ("Initial Motion") partially on the grounds that no tax-sharing agreement exists between Debtor and the Bank. (2 ER 15–95.) Trustees filed an Opposition to the Initial Motion where they alleged that the tax-sharing agreement "is evidenced, in part, by the [ATP]." (2:14–ap–01221–ER Dkt. 31 at 7.) Trustees also cited Ninth Circuit precedent establishing that a tax-sharing agreement can be implied, but offered no evidence that such an implied tax-sharing agreement existed between Debtor and the Bank. (Id. at 7.) The Bankruptcy Court issued a Memorandum of Decision ("Memorandum of Decision") on October 2, 2014 granting the Initial Motion with leave to amend. (3 ER 95.1–95.21.) In its Memorandum of Decision, the Bankruptcy Court rejected Trustees' argument that the ATP formed an express tax-sharing agreement between Debtor and the Bank because the Bank did not sign the ATP or otherwise agree to be bound by the ATP. (3 ER 95.15–95.16.) It also expressed doubt regarding Trustees' argument, raised for the first time in the Opposition to the Initial Motion, that an implied tax-sharing agreement existed between Debtor and the Bank. (3 ER 95.16–95.17.) The Bankruptcy Court held that Trustees had not alleged an implied tax-sharing agreement by reference to the ATP, and noted that any implied tax-sharing agreement between Debtor and the Bank would likely interfere with Debtor's obligation under the ATP (which Debtor itself conceded it was bound by) to "do nothing to benefit itself financially at the expense of [the Bank]" and to "make all tax payments at the Bank level." (Id.; 5 ER 102 ¶ 17.) Nevertheless, the Bankruptcy Court, based solely "on the required liberality" in granting leave to amend, permitted Trustees an opportunity

to amend their Initial Complaint to allege additional facts to suggest that an implied tax-sharing agreement existed between Debtor and the Bank that did not conflict with Debtor's obligations under the ATP. (*Id.*) The Bankruptcy Court entered its initial order pursuant to its Memorandum of Decision ("Initial Order") that same day. (4 ER 96–97.)

On November 21, 2014, Trustees filed their FAC. (5 ER 98–130.) Trustees again sought declaratory relief that the Liquidating Trust was entitled to the Refund.[7] (5 ER 106.) The allegations in the FAC relating to the requested declaratory relief were almost identical to the allegations in the Initial Complaint. In fact, the only differences between the FAC and the Initial Complaint with respect to Trustees' claim for declaratory relief were: (1) the FAC directly quoted and attached the ATP[8]; and (2) the FAC suggested that an implied agreement existed because "the Bank was aware of the policies and practices described" in the ATP and of other Debtor practices, "acted in accordance

with them, and accepted the benefits to the Bank of such policies and practices." (5 ER 102 ¶¶ 17–21.)

The FDIC–R filed a Motion to Dismiss the FAC ("Motion") again on the ground that no tax-sharing agreement existed between Debtor and the Bank. (6–7 ER 131–266; 2:14–ap–01221–ER Dkts. 52–53, 56, 59.) In its Motion, the FDIC–R revealed that it received the Refund.[9] (7 ER 208 n.5.) On February 6, 2015, Trustees filed their opposition to the Motion ("Opposition"), advancing very few additional arguments, and relying primarily on the fact that the Bank acted in accordance with the ATP as the basis of the implied tax-sharing agreement.[10] (2:14–ap–01221–ER Dkt. 66.) The FDIC–R filed its reply in support of its Motion ("Reply to Motion") on April 1, 2015. (11 ER 316–25.) The Bankruptcy Court entered its Order on April 9, 2015 granting the FDIC–R's Motion with respect to Trustees' claim for declaratory relief. (12–13 ER 326–59.)

The Bankruptcy Court held that Trustees failed to allege facts sufficient to sup-

---

7. Trustees asserted other claims in their FAC that are not subject to appeal. (5 ER 103–05, 107–08.) While Trustees mention their claim to an accounting under 12 U.S.C. § 1821(d)(15)(c) in passing in the introduction section of their Opening Brief, (Opening Brief at 3), they do not discuss this claim in any detail. The Court deems this claim waived and does not address it. *Rizk v. Holder*, 629 F.3d 1083, 1091 n.3 (9th Cir. 2011) (issues not raised in an opening brief are waived).

8. Again, despite relying almost exclusively on the ATP as the basis of the tax-sharing agreement in their FAC, Trustees provided very little information about the implementation of the ATP and how similar agreements are perceived in the industry.

9. This was proper under 26 U.S.C.A. § 6402 (k), which provides:

Notwithstanding any other provision of law, in the case of an insolvent corporation which is a member of an affiliated group of corporations filing a consolidated return for

any taxable year and which is subject to a statutory or court-appointed fiduciary, the Secretary may by regulation provide that any refund for such taxable year may be paid on behalf of such insolvent corporation to such fiduciary to the extent that the Secretary determines that the refund is attributable to losses or credits of such insolvent corporation.

See *Clark Cty. Bancorporation v. U.S. Dep't of the Treasury*, No. C14–5811 BHS, 2015 WL 3751943, at *1 (W.D. Wash. June 16, 2015) (holding it was proper for the IRS to pay the FDIC–R, on behalf of consolidated group's subsidiary, tax refunds where the refunds were attributable to the subsidiary's losses).

10. In light of the FDIC–R's comment in its Motion that it received the Refund, Trustees filed a motion for leave to amend the FAC to add a claim for turnover of the Refund in connection with their Opposition, (8 ER 267–306), but Trustees later withdrew this motion without prejudice pursuant to a court-approved stipulation. (9–10 ER 307–15.)

port the existence of an implied tax-sharing agreement, as permitted by the Ninth Circuit in *Western Dealer Management Inc. v. England (In re Bob Richards Chrysler–Plymouth Corp.)* ("*Bob Richards*"), 473 F.2d 262 (9th Cir. 1973). (12 ER 342–51.) First, the Bankruptcy Court held that the additional allegations were insufficient to establish an implied agreement because (1) they do not establish any intent of the Bank to be bound by the ATP; and (2) even if the allegations established that the Bank intended to be bound by the ATP, none of the provisions speak to tax-sharing agreements or create a debtor-creditor relationship between Debtor and the Bank. (12 ER 344–48.) The Bankruptcy Court noted that it already considered the ATP in connection with its Memorandum of Decision and held that the ATP did not in isolation establish an implied or express tax-sharing agreement. (12 ER 344.) Thus, it held that acting in accordance with the ATP would also not establish a tax-sharing agreement. (*Id.*) Second, the Bankruptcy Court again held that the alleged implied tax-sharing agreement would be inconsistent with Debtor's obligation under the ATP to "do nothing to benefit itself financially at the expense of [the Bank]" and to "make all tax payments at the Bank level." (12 ER 349–51.) Because such an implied agreement would be inconsistent with Debtor's obligations under the ATP, and because any amendment would be futile, the Bankruptcy Court dis-

missed the claim with prejudice. (12 ER 351–52.)

On April 22, 2015 Trustees filed a Notice of Appeal from the April 9 Order and elected to have the appeal heard by this Court. (14 ER 360–98.) On the same day, Trustees filed their Rule 54(b) Motion seeking the Bankruptcy Court's certification of the April 9 Order as final and appealable. (15 ER 399–406.) On May 27, 2015, the Bankruptcy Court entered the Amended Order, which certified the April 9, 2015 Order as a final and appealable order. (16 ER 407–08.)

Trustees filed their notice of appeal from the Order on July 5, 2015. (17 ER 409–14.) Trustees filed their Opening Brief on July 29, 2015 (Dkt. 8.) The FDIC–R filed its Answering Brief on August 12, 2015. (Dkt. 10.) Trustees filed their Reply Brief on August 26, 2015. (Dkt. 12.) Trustees indicate in their Opening Brief that they are appealing the Bankruptcy Court's Amended Order with respect to its dismissal of Trustees' claim "that an implied contract existed between [Debtor] and the Bank regarding the treatment of the Refund" without leave to amend.[11] (Opening Brief at 2.)

## III. CLAIMS ON APPEAL

The Court characterizes the claims on appeal as follows:

---

11. Trustees state that the FDIC–R "erroneously characterizes the question before this Court." (Opening Brief at 1.) The FDIC–R characterizes the question as being whether the Court should "alter the order of the Bankruptcy Court, which dismissed with prejudice Count 2 of [Trustee's FAC] ('Declaratory Relief: That the Liquidating Trust is Entitled to the Entirety of the Refund and the FDIC has Merely a General Unsecured Claim'), for failure to plead facts supporting such a claim, notwithstanding Plaintiffs having been granted two opportunities to plead facts to support

it." (18 ER 416.) Trustees claim that the issue is whether "Trustees alleged in the FAC facts sufficient to state a claim that an implied contract exists between ... [Debtor] and the Bank regarding the treatment of" the Refund "such that the Refund is properly treated as property of [Debtor's] bankruptcy estate." (Opening Brief at 2.) The Court holds that this is a distinction without difference. Both questions involve the same inquiry—whether Trustees alleged sufficient facts to establish that an implied tax-sharing agreement exists between Debtor and Trustees.

(1) Whether Trustees alleged sufficient facts in its FAC that suggest that an implied tax-sharing agreement exists between Debtor and the Bank [12] such that the refund is the property of Debtor's bankruptcy estate?

(2) Whether the Bankruptcy Court erred in holding that any implied tax-sharing agreement would conflict with Debtor's obligations under the ATP, which Debtor is bound by, and thus that any amendment would be futile?

## IV. STANDARD OF REVIEW

 "A bankruptcy court's findings of fact are reviewed for clear error and its conclusions of laws are reviewed *de novo*." *In re Clark,* 262 B.R. 508, 514 (9th Cir. BAP 2001) (citing *Smith v. Kennedy (In re Smith* ), 235 F.3d 472, 475 (9th Cir. 2000)). "A lower court's findings are reversible for clear error when the appellate court is left with a definite and firm conviction that a mistake has been committed." *Id.* at 514 (citing *United States v. Maldonado,* 215 F.3d 1046, 1050 (9th Cir. 2000), *cert. denied,* 531 U.S. 1172, 121 S.Ct. 1141, 148 L.Ed.2d 1004 (2001)). "Mixed questions of law and fact are generally reviewed *de novo*." *Id.* (citing *Diamond v. City of Taft,* 215 F.3d 1052, 1055 (9th Cir. 2000), *cert. denied,* 531 U.S. 1072, 121 S.Ct. 763, 148 L.Ed.2d 665 (2001)). "The interpretation of a contract is a mixed question of law and fact." *Miller v. Safeco Title Ins. Co.,* 758 F.2d 364, 367 (9th Cir. 1985). "When the ... court's decision is based on an analysis of the contractual language and an application of the principles of contract interpretation, that decision is a matter of law and reviewable *de novo*." *Id.* In contrast, "[w]hen the inquiry focuses on extrinsic evidence of related facts, ... the ... court's conclusions will not be reversed unless they are clearly erroneous." *Id.* The Bankruptcy Court's dismissal of Trustees' claim for declaratory relief was based on an analysis of the ATP and the parties' conduct in accordance with the ATP and whether that agreement and the parties' conduct established an implied contractual relationship between Debtor and the Bank.

The Bankruptcy Court did not make any findings of fact as it employed the standard of review required when ruling on a motion to dismiss. A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the claims stated in the complaint. To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks omitted). "Allegations in the complaint, together with reasonable inferences therefrom, are assumed to be true for purposes of the motion," *Odom v. Microsoft Corp,* 486 F.3d 541, 545 (9th Cir. 2007), and must be construed in the "light most favorable" to the moving party. *Watison v. Carter,* 668 F.3d 1108, 1112 (9th Cir. 2012).

---

**12.** Whether the ATP constitutes an express tax-sharing agreement is not subject to this appeal. (Opening Brief at 2) (Trustees are appealing the Bankruptcy Court's Order with respect to whether an implied tax-sharing agreement exists.); *Rizk,* 629 F.3d at 1091 n.3

(issues not raised in an opening brief are waived). Trustees have since conceded that the ATP does not constitute an express tax-sharing agreement. (Opening Brief at 17 ("[T]here is no pre-existing express contract alleged in the FAC.").)

■ Accordingly, this Court reviews the Order *de novo*.

## V. DISCUSSION

### A. Implied Tax–Sharing Agreement

■ Trustees first claim that the Bankruptcy Court erred by rejecting their argument that "the Refund is property of ... [Debtor's] bankruptcy estate ... by virtue of an implied agreement between ... [Debtor] and the Bank, evidenced by the ATP and the conduct of ... [Debtor] and the Bank, that establishes a debtor/creditor relationship between them such that the Refund is not held in trust for the Bank." (Opening Brief at 10.) The parties are free to explicitly or implicitly agree to "adjust among themselves the ultimate tax liability." *Bob Richards*, 473 F.2d at 264. An agreement can be implied where there is "mutual assent or offer and acceptance, consideration, legal capacity and a lawful subject matter." *Northstar Fin. Advisors Inc. v. Schwab Investments*, 779 F.3d 1036, 1050–51 (9th Cir.), *as amended on denial of reh'g and reh'g en banc* (Apr. 28, 2015), *cert. denied*, ── U.S. ──, 136 S.Ct. 240, 193 L.Ed.2d 133 (2015) (quoting 1 Richard A. Lord, Williston on Contracts § 1:5 at 37–38 (4th ed. 2007)). A party can indicate its intent to be bound by accepting the benefits of the agreement. *Money Store Investment Corp. v. Southern California Bank*, 98 Cal.App.4th 722, 728–29, 120 Cal. Rptr.2d 58 (2002). However, unless there is an agreement to the contrary, "a tax refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member." *Bob Richards*, 473 F.2d at 265. "Allowing the parent to keep any refunds arising solely from a subsidiary's losses simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting unjustly enriches the parent." *Id.*

In their Opening Brief, Trustees point to the following allegations in the FAC that they contend establish an implied agreement between Debtor and the Bank:

- Historically, Debtor "'filed, on its own behalf and on behalf of the Bank and any subsidiaries'" the consolidated tax returns with the IRS. (Opening Brief at 10 (quoting 5 ER 101 ¶ 16).)

- Debtor adopted an ATP that "specifie[s] the manner in which taxes associated with" consolidated tax returns "would be allocated and treated among ... Debtor and the Bank." (5 ER 102 ¶ 17; Opening Brief at 10.) Trustees cite the following provisions of the ATP in support of their claim that an implied tax-sharing agreement exists:

 o The tax returns of Debtor "'and its subsidiaries are prepared on a consolidated basis in which ... [Debtor] is the taxpayer of record.'" (5 ER 102 ¶ 18 (quoting 5 ER Ex. A at 112).)

 o "[A]lthough 'the Bank typically generates a profit, while ... [Debtor] (on a stand-alone basis) typically incurs a loss,' it would be inconsistent with ... [Debtor's] general policy of acting as a source of financial strength for the Bank for [Debtor] 'to collect the portion of the overall tax expense attributable to the Bank's profit from the Bank.'" (5 ER 102 ¶ 18 (quoting 5 ER Ex. A at 112).)

 o Debtor's "'practice is to make all tax payments at the Bank level,' in order to allow the Bank to benefit through the use of funds during the period between any taxable profits are generated and the re-

sulting taxes are paid and to 'benefit from tax losses which are incurred by ... [Debtor] and [its] subsidiaries.' " (5 ER 102 ¶ 18 (quoting 5 ER Ex. A at 113).)

● " '[I]t was the policy *and practice of ... [Debtor] to pay to or direct to be paid to the Bank any and all refunds due under the consolidated returns of ... [Debtor] and its subsidiaries prepared and filed by ... [Debtor] as taxpayer of record.'* " (Opening Brief at 10 (citing 5 ER 102 ¶ 19).)

● "That the Bank was aware of these policies and practices evidenced by the [ATP] and the actions of ... [Debtor], and *'acted in accordance with them,* and *accepted the benefits to the Bank* of such policies and practices,' including by *'accepting refunds of taxes arising under the consolidated returns filed by [Debtor] as taxpayer of record that were directed or otherwise transferred to the Bank by ... [Debtor].'* " (Opening Brief at 11 (citing 5 ER 102 ¶ 20).)

● "That *'[b]y virtue of actions and conduct of the Bank and ... [Debtor]* set forth in the foregoing paragraphs, *an agreement was formed and exists between the Bank'* " and Debtor concerning how " 'taxes associated with' " the consolidated returns " *'would be allocated between ... [Debtor] and the Bank.'* " (Opening Brief at 11 (quoting 5 ER 103 ¶ 21).)

● "That this agreement ... allocates between ... [Debtor] and the Bank the benefits and burdens of taxes and/or refunds that may be or become owed and/or due in connection with Consolidated Returns filed on behalf of ... [Debtor] and its subsidiaries, including the Bank." (Opening Brief at 11 (quoting 5 ER 106 ¶ 33); 1 ER 6 ¶ 29.)

● "That no trust was created by" the tax-sharing agreement, " 'and no grounds exist for implying such a trust.' " (Opening Brief at 11 (quoting 5 ER 106 ¶ 34); 1 ER 7 ¶ 30.)

● "That a debtor/creditor relationship was created between ... [Debtor] and the Bank as a result of the" tax-sharing agreement." (Opening Brief at 11 (citing 5 ER 106 ¶ 35); 1 ER ¶ 31.)

Trustees seem to suggest that the above provisions, which confer benefits to the Bank at the expense of Debtor, suggest that the Bank should also share in any burdens resulting from taxes and tax refunds, including sharing such tax refunds with Debtor, its parent. Accepting the above allegations as true and in the light most favorable to Trustees,[13] *Watison,* 668 F.3d at 1112, the Court holds that Trustees failed to establish an implied tax-sharing agreement between Debtor and the Bank in their FAC.

### 1. Allegations Relating to the Consolidated Tax Returns and to the ATP

The fact that taxes are prepared on a consolidated basis and that Debtor is typically the taxpayer of record (Opening Brief at 10 (citing 5 ER 101 ¶ 16); (5 ER 102 ¶ 18) (citing 5 ER Ex. A at 112)) is irrelevant and does not establish an implied tax-sharing agreement between

---

**13.** The Court disagrees with Trustees' contention that the Bankruptcy Court "failed to correctly apply this standard." (Opening Brief at 13.) The Bankruptcy Court did not dismiss the FAC because it questioned the veracity of Trustees' allegations. Instead, the Bankruptcy Court dismissed the FAC because even when accepting the allegations as true and in the light most favorable to Trustees, the allegations did not establish that an implied contract exists between Trustees and the Bank. (12 ER 342–51.)

Debtor and the Bank. *Bob Richards* specifically held that consent "to the filing of a consolidated tax return ... cannot be construed to include the transfer of a [refund] without further consideration." 473 F.2d at 264. And it was the FDIC–R, not Debtor who was the taxpayer of record for the amended tax returns. (5 ER 103 ¶ 22.) Regardless, *Bob Richards* rejected the notion that the refund should inure to the taxpayer of record who is only collecting the tax refund directly because of procedural tax regulations relating to filing and collecting tax refunds. 473 F.2d at 265. As the court in *Bob Richards* noted, there are no procedural tax regulations regarding "the subsequent disposition of tax refunds." *Id.*

The remaining provisions in the ATP that Trustees allege in their FAC and reference in their Opening Brief do not plausibly allege an implied tax-sharing agreement between Debtor and the Bank. First, the ATP does not suggest any intent by the Bank to be bound by the ATP. The FAC only alleges that Debtor, not the Bank, agreed to be bound by the ATP. (5 ER 102 ¶ 17.) Even Trustees recognize that the FAC "*particularly*" alleges performance by Debtor. (Opening Brief at 15 (emphasis added).) None of Debtor's policies referenced in the ATP are binding on the Bank.

Even if some portions of the ATP are binding on the Bank, there is no language in the ATP that suggests a tax-sharing agreement that would inure to Debtor's benefit. Debtor's general policy to act as a source of financial strength for the Bank (5 ER 102 ¶ 18 (citing 5 ER Ex. A at 112).) is not binding on the Bank. Nor is Debtor's practice to make tax payments at the Bank level (5 ER 102 ¶ 18 (quoting 5 ER Ex. A at 113)) binding on the Bank. None of these allegations speak to the Bank's conduct or the Bank's policies. Second, even if the Bank was somehow

bound by the ATP, the ATP does not even mention tax refunds, let alone suggest a tax-sharing agreement exists between Debtor and the Bank. The allegations certainly do not establish an agreement by the Bank to share any refunds with Debtor that resulted from offsetting the Bank's own losses against its income. In fact, these allegations undermine Debtor's argument because as discussed below, such a tax-sharing agreement would interfere with Debtor's obligation to act as a source of financial strength for the Bank.

Debtor also alleges that "it was the policy and practice of ... [Debtor] to pay to or direct to be paid to the Bank any and all refunds due under the consolidated returns of ... [Debtor] and its subsidiaries prepared and filed by ... [Debtor] as taxpayer of record." (Opening Brief at 10 (citing 5 ER 102 ¶ 19).) Again, this was Debtor's policy that does not appear to be binding on the Bank and that does not suggest that a tax-sharing agreement exists between the parties. To the contrary, the fact that Debtor paid the Bank refunds due under the consolidated returns, if anything, suggests that the Bank intended to retain the Refund.

### 2. Allegations Relating to Acting in Accordance with and Accepting the Benefits of the ATP and Debtor's Other Practices and Policies

In Paragraph 20 of the FAC, Trustees allege that an implied agreement exists because the Bank, by acting in accordance with and accepting the benefits of the ATP and Debtor's other practices and policies, intended to enter into a tax-sharing agreement. Trustees contend that they have established that the Bank intended to be bound by an implied tax-sharing agreement:

It is explicitly alleged in paragraphs 19–21 of the FAC that: (a) the Bancorp, in addition to abiding by the terms of the ATP, had a "practice and policy of pay-

ing or directing to be paid to the Bank any and all refunds due under" the Consolidated Returns that Bancorp had filed as taxpayer of record; (b) the Bank was at all relevant times "aware of the policies and practices [relating to the tax provisions of the ATP and Bancorp's policy and practice with respect to payment of refunds] and "accepted the benefits to the Bank of such policies and practices;" and (c) "[b]y virtue of the actions and conduct of the Bank and the Bancorp set forth in the foregoing paragraphs, an agreement was formed and exists between the Bank and the [Bancorp]."

(Opening Brief at 13–14) (quoting 5 ER 102 ¶¶ 19–21 (alterations in original).)

However, as discussed above, neither the ATP nor the fact that Debtor paid the Bank refunds due under their consolidated tax returns establish an agreement by the Bank to relinquish any tax refunds. The fact that the Bank acted in accordance with and accepted the benefits of practices and policies that does not in isolation establish a tax-sharing agreement, certainly does not establish that a tax-sharing agreement somehow exists. While Trustees are correct that the Bank can indicate their intent to be bound by performing their obligations under the agreement, here Bank's alleged performance is entirely unrelated to the tax-sharing agreement Trustees contend exists.[14] In other words, Trustees have alleged no agreement that the Bank could accept through its performance.

The remaining allegations are legal conclusions and are not supported by the Trustees' factual allegations. "While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Ashcroft*, 556 U.S. at 664, 129 S.Ct. 1937. A complaint that contains only "labels and conclusions" will not survive a motion to dismiss. *Bell Atl. Corp.*, 550 U.S. at 555, 127 S.Ct. 1955. Trustees allege that: (1) there was a tax-sharing agreement between the Bank and Debtor (Opening Brief at 11 (citing 5 ER 106 ¶ 33)); (2) no trust was created by the tax-sharing agreement; (*Id.* (citing 5 ER 106 ¶ 34)); and (3) a debtor/creditor relationship was created between Debtor and the Bank. (*Id.* (citing 5 ER 106 ¶ 35)). As discussed above, Trustees seem to suggest that because the Bank benefits from the ATP and from Debtor's other practices and policies at Debtor's expense, it must also share any burdens associated with taxes and tax refunds, including sharing tax refunds attributable to its losses with Debtor. The Court disagrees again because Trustees failed to allege facts that would support any intent by the Bank to

---

**14.** Trustees attempt to distinguish this case from *Benton v. Baker Hughes*, which the Bankruptcy Court relied on to establish the elements of an implied contract claim. (Opening Brief at 13 (citing *Benton v. Baker Hughes*, 2013 WL 3353636, at *5–6 (C.D. Cal. June 30, 2013)); (12 ER 346).) In *Benton*, the court held that the plaintiff failed to establish the defendant's intent to enter a binding contract with the plaintiff. 2013 WL 3353636, at *5–7. Trustees point to paragraphs 19–21 of the FAC to distinguish the current case with *Benton*, but this Court analyzed those allegations *supra* and held that those allegations do not establish the Bank's intent to enter a binding contract with Debtor.

Trustees also point to *Money Store Investment Corp.* and *Dick v. Woolson* to support their contention that an implied contract exists here. (Opening Brief at 14–15) (citing *Money Store Investment Corp.*, 98 Cal.App.4th at 728–29, 120 Cal.Rptr.2d 58; *Dick*, 106 Cal.App.2d 415, 419, 235 P.2d 119 (1951).) But those cases are distinguishable. In *Money Store Investment Corp.* and in *Dick*, the courts held that the parties intended to be bound by the contracts—the very element this Court held *supra* is missing here. *Money Store Investment Corp.*, 98 Cal.App.4th at 728–29, 120 Cal.Rptr.2d 58; *Dick*, 106 Cal.App.2d at 419–20, 235 P.2d 119.

be bound by an agreement where it would share the burdens associated with taxes and tax refunds, including by relinquishing their tax refunds. Because there are no factual allegations to support the existence of a tax-sharing agreement or a debtor/creditor relationship, these legal conclusions cannot save Trustees' otherwise deficient claim that an implied tax-sharing agreement exists between Debtor and the Bank.

### B. Dismissal with Prejudice

 Trustees next claim that the Bankruptcy Court erred by "denying leave to amend" on the basis that "the implied agreement alleged in the FAC could not exist consistently with ... [Debtor's] obligations" under the ATP. (Opening Brief at 2.) The Bankruptcy Court held that "Trustees have failed to allege *and cannot allege* an implied agreement that contradicts an express policy to which Debtor acknowledged it was bound." (12 ER 350 (citing FAC ¶ 17).) The Bankruptcy Court elaborated:

> Even though there is no agreement, express or implied, to be contravened, ... Debtor acknowledges that it is bound by the terms of the General Policy of the ATP, yet seeks to contravene the terms of the ATP with an alleged, implied agreement. Notwithstanding the fact that there is no agreement here, ... Trustees' argument is contrary to fundamental principles of contract construction because *they acknowledge and allege that ... Debtor was bound to act in accordance with the ATP*, even if the Bank was not.... Trustees [sic] argument is that there was an implied agreement that contravened the express terms to which it was bound. This assumption undermines ... Trustees' po-

sition. The conflict inherent in ... Trustees' position militates against any finding that their allegations can be amended to state a plausible claim for relief. There is no cognizable legal theory present in the facts as alleged and, as set forth below, dismissal of this claim without leave to amend is appropriate.

(12 ER 350.) Specifically, the Bankruptcy Court referenced its prior holding in its Memorandum of Decision that the alleged implied agreement would contradict with (1) Debtor's obligation to "do nothing to benefit itself financially at the expense of the financial condition" of the Bank; and (2) Debtor's obligation to make tax payments at the Bank level to ensure that the Bank will retain the possession and use of the returns, which strengthens the Bank's financial position. (*Id.* at 349–50 (citing 3 ER 95.16).)

 While this Court recognizes that leave to amend should be granted liberally, *Ashurst Land & Cattle, LLC v. Rancho Mountain Properties, Inc.*, 609 Fed.Appx. 500, 501 (9th Cir. 2015), "a party is not entitled to an opportunity to amend his complaint if any potential amendment would be futile." *Mirmehdi v. United States*, 689 F.3d 975, 985 (9th Cir. 2012). Further, "[a] ... court's discretion over amendments is especially broad 'where the court has already given a plaintiff one or more opportunities to amend his complaint.'" *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 n.3 (9th Cir. 1987) (quoting *Mir v. Fosburg*, 646 F.2d 342, 347 (9th Cir. 1980)).

Although the Bank was not bound by the ATP, Debtor, who acknowledged that it "agreed to adopt and did adopt" the ATP (5 ER 102 ¶ 17), is certainly bound by the ATP.[15] If the terms of the ATP conflict

---

**15.** The Court disagrees with Trustees' argument that this principle does not apply because "there is no pre-existing express con-

tract alleged in the FAC." (Opening Brief at 17.) Trustees cannot seriously contend that

with the implied tax-sharing agreement Trustees contend exists, then no implied tax-sharing agreement can exist, *Swanson v. Levy*, 509 F.2d 859, 861 (9th Cir. 1975) ("An action does not lie on an implied contract where there exists between the parties a valid express contract which covers the same subject matter."), and the Bankruptcy Court did not err by holding that any amendment would be futile. *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991) (A "court does not err in denying leave to amend where the amendment would be futile.").

An implied tax-sharing agreement that would require the Bank to relinquish its rights to the Refund that is attributable to the Bank's own losses directly conflicts with Debtor's obligation to "do nothing to benefit itself financially at the expense of the financial condition of" the Bank. (5 ER Ex. A at 112.) The ATP recognizes that if Debtor "collect[ed] the portion of the overall tax expense attributable to the Bank's profit from the Bank, this would be inconsistent with the General Policy, in that ... [Debtor] would not be serving as a source of financial strength for the Bank." (5 ER Ex. A at 112.) Requiring the Bank to relinquish its right to $29 million attributable to its losses would be no different as it would certainly benefit Debtor financially at the expense of the Bank. This is directly contrary to the terms of the ATP.

Trustees' arguments as to why an implied tax-sharing agreement would not conflict with the ATP are unavailing and nonsensical. First, Trustees state that the allegations in the FAC are consistent with the ATP and with Debtor's obligation to act as a source of strength for the Bank. (Opening Brief at 16; Reply Brief at 7–8.) As the Court held *supra*, the ATP does not establish that an implied tax-sharing

agreement exists amongst the parties. Nor does the fact that the parties acted in accordance with the ATP establish that an implied tax-sharing agreement exists amongst the parties. Trustees claim that the allegations in the FAC, which directly quote the ATP or broadly state that the parties acted in accordance with the ATP, are consistent with the ATP. Trustees are essentially arguing the obvious—that the terms of the ATP are consistent with the terms of the ATP. The issue is more complicated and is whether an implied tax-sharing agreement, which has not been proven by reference to the ATP, would be consistent with the terms of the ATP. The Court holds that it would not be.

Next, Trustees argue that "the mere existence of a debtor/creditor relationship resulting from the implied ... [a]greement between ... [Debtor] and the Bank is not *per se* harmful to the Bank" because "[t]he only imaginable circumstance in which the Bank (and the FDIC–R as receiver) could be prejudiced by ... such a relationship is bankruptcy by ... [Debtor]." (Reply Brief at 8; Opening Brief at 17–18.) Trustees claim that "this prejudice [would] not [be] a result of the implied [t]ax [s]haring [a]greement, but rather a consequence of ... [Debtor's] bankruptcy and the fundamental and equitable principle of ratable distribution in bankruptcy." (Opening Brief at 18.) The Court disagrees. Because there is no tax-sharing agreement, there is no debtor/creditor relationship between the parties, and pursuant to *Bob Richards*, the Refund belongs to the Bank, not to Debtor, and is not subject to ratable distribution. 473 F.2d at 265. Accordingly, this rationale does not apply. The Court also notes that there is no qualifying term in the ATP that suggests that the general

they were not bound by the ATP when they acknowledged that they "agreed to adopt and

did adopt" the ATP. (5 ER 102 ¶ 17.)

rule (that Debtor should refrain from doing anything that interferes with the Bank's financial condition), does not apply when Debtor declares bankruptcy.

Because any alleged tax-sharing agreement between Debtor and the Bank would conflict with the ATP, which is binding on Debtor, any amendment would be futile. Further, as the Bankruptcy Court noted, Trustees were unable to state a claim in their FAC despite being given "clear guidance as to the deficiencies of the [Initial] Complaint" and despite receiving "an extension of time to file the FAC." (12 ER 352.) The Court cannot conceive of any situation where Trustees would be able to state a claim by including additional allegations or otherwise modifying the FAC. Accordingly, the Bankruptcy Court did not err in denying leave to amend.

## VI. CONCLUSION

For the reasons set forth above, the judgment of the bankruptcy court is AFFIRMED.

**IT IS SO ORDERED.**

